No. 87,294

STATE OF KANSAS, *Appellee,* v. BENNY R. SMITH, *Appellant.*
(92 P.3d 1096)

Opinion filed June 25, 2004.

*Rhonda Keylon Levinson,* of Gibbens, Levinson & Levinson, of Basehor, argued the cause, and *Carl F.A. Maughan,* of Law Offices of Carl Fredrick Alexander Maughan, L.L.C., of Wichita, was on the brief for appellant, and *Benny R. Smith,* appellant, was on a supplemental brief pro se.

*Debra S. Peterson,* deputy district attorney, argued the cause, and *Nola Foulston,* district attorney, and *Phill Kline,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Benny Ray Smith was convicted of premeditated first-degree murder and sentenced to life in prison. This is his direct appeal. We affirm.

Smith's conviction arose out of the shooting death of Michelle Scott. Evidence presented at trial demonstrated that Scott was shot in the head at close range. The entrance wound was behind her left ear.

Smith lived with Scott and her 12-year-old son. Smith kept his gun under the bed in the bedroom he shared with Scott. On the evening of the shooting, Smith, Scott, and a friend, Judy Perry, were drinking alcohol and smoking crack cocaine in that bedroom. Smith and Scott left the bedroom, and there were different versions of the events that followed.

Perry testified that Smith and Scott were not arguing when they left the bedroom. She heard Scott's body hit the ground but did not hear a gunshot. After she heard Scott fall, Scott's son told Perry: "I think he done shot my mama . . . She done fell on the ground." Smith was gone. After a few moments, the boy called 911.

The boy testified that he woke up to the sound of Smith and Scott screaming at each other. He went to the door of his bedroom but could not see them. He could see Perry. He returned to his bed and heard Smith say twice, "I'm going to shoot you." He said he then saw Smith look under the bed in the adults' bedroom and walk toward the living room. The boy heard a gunshot and his mother's body fall. As he went to call 911, he heard a screen door shut.

Smith testified that, on the night of the shooting, Scott had learned a nearby drug bust was being blamed on her. She had seen a strange car in front of the house, and she told Smith to get his gun because she was nervous. He therefore put the gun in his pants. Smith said Perry started to yell for Scott to bring a pipe to her. When Smith gave Perry a pipe off of the floor, Scott became upset; and Smith decided to leave to avoid an argument. He walked onto the front porch to see if the strange car was still there. When he turned to reenter the house to get some clothes, Scott tried to grab the gun from his pants. Smith continued:

> "I had her wrist like this (indicating) trying to get it out, and I had on the stretch pants. I dropped my pants down like this (indicating) to get it out, and we was tussling with the gun. I had her wrist most of the time. She had her hand on the grip of the gun and stuff. We tussled like that for a bit. I kept saying to myself, 'Get the clip out. Get the clip out.' When I got the clip, I knew when it hit the porch. . . . [S]he quits fighting. I'm leaning up against the storm door. She brushed past me . . . and she walked in the living room, and she just fell down, collapsed. . . . I don't know if she hit her head or what. . . . I just left."

Smith went to Namon Battle's house. Battle would not let Smith in. Smith then went to Charlie's Loudermilk's house, leaving the gun in Battle's front yard. When Smith arrived at Loudermilk's house, he said, "I think I shot her."

Scott's son gave the police Battle's address. When they arrived, Battle informed the police that Smith might be at Loudermilk's house. Loudermilk let the police into his house, and they saw a man lying on a couch who fit the description of Smith given to them by Scott's son. When the police asked the man to identify himself, he said his name was "Rodriguez." When Loudermilk correctly identified the man as Smith, the police placed Smith under

arrest. They photographed Smith in jail clothing, and the photographs were later used at trial to show that Smith had not sustained injuries to his hands, neck, or face when he struggled with Scott.

The gun was recovered from Battle's yard and examined. One officer testified that blood and hair were on the gun. Another officer testified that there was a crack on the magazine of the gun and that it took 7.8 pounds of pressure to pull its trigger.

The medical examiner testified that she found it "highly improbable that [Scott's] contact gunshot wound occurred during a struggle." Scott also had sustained other injuries, including a laceration on her forehead consistent with the length of the gun's magazine, bruises on her head and lips, and "defensive" wounds on her hand and arm.

In an interview with police, Battle stated he had seen Smith's gun in the past. Battle said Smith had asked him to hold the gun because Smith was in trouble for having fired it at someone.

Scott's son also had been interviewed by police. At first he claimed that he saw Smith put the gun to the back of Scott's head. He later admitted he had not seen the shooting. Scott's son also told police that Smith had fired the gun in the past.

Before trial, Smith requested discovery of records from the Kansas Department of Social and Rehabilitation Services (SRS) regarding Scott and her son. The district court denied the request, holding Smith had not demonstrated the records' relevance.

During voir dire, Smith made a *Batson* challenge to one of the State's peremptory strikes. See *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986). The prosecutor stated the juror was struck because she was unmarried, not because of her race, noting the State was "interested in having someone who has at least been in a . . . long-term relationship." The prosecutor also pointed out that she and the defense had each struck other single venire members and that two African-Americans remained on the jury. The district court rejected Smith's *Batson* challenge.

### Issues in Appellate Counsel's Brief

Smith's original appellate counsel briefed 11 issues for our consideration. That lawyer was later permitted to withdraw. After two

replacements also withdrew, the lawyer ultimately appointed to represent Smith appeared at oral argument and said she had been specifically instructed by her client to argue none of the issues briefed by original appellate counsel and to focus only on issues raised in Smith's pro se supplemental brief.

Although we would generally discourage such a course of action on the part of a criminal defendant, Smith's explicit abandonment of the 11 issues briefed by his first lawyer caused him no legal prejudice in the unique circumstances of this case. None would have led to reversal. Despite the abandonment, the gravity of Smith's crime and the likelihood that he will pursue future collateral challenges to his conviction prompts us to address each of the 11 issues briefly in the following list.

(1) The district court did not abuse its discretion by refusing to allow discovery of SRS records on Scott and her son. Smith demonstrated no link between the likely content of the records and his trial claim of self-defense. A reasonable person could easily have taken the position of the district court. See *State v. Kessler*, 276 Kan. 202, 212, 73 P.3d 761 (2003) (district court's ruling on discovery subject to abuse of discretion standard; such discretion abused "only when no reasonable person would take the view adopted by the trial court").

(2) The district court did not abuse its discretion in rejecting Smith's *Batson* challenge. See *State v. Bradford*, 272 Kan. 523, 529, 34 P.3d 434 (2001). A reasonable person could agree with the district judge's conclusions that the prosecutor met her burden of articulating a race-neutral reason for striking the juror and that Smith failed to establish purposeful discrimination. See *Batson*, 476 U.S. at 98. Moreover, this court has upheld similar strikes in the past. See *State v. Caenen*, 270 Kan. 776, 790, 19 P.3d 142 (2001) (*Batson* challenge fails; potential juror struck because "he was a single man with 'limited, little or no contact' with children," not because he was African-American); *State v. Gadelkarim*, 256 Kan. 671, 691-92, 887 P.2d 88 (1994)

(prosecution argues strike supported by juror's unmarried status and inattention; all other single jurors struck; *Batson* challenge fails).

(3) The district court did not abuse its discretion in admitting the photographs of Smith in jail clothing. The photographs constituted direct evidence of whether Smith had visible injuries at the time of his arrest, evidence relevant to his account of the scuffle over the gun and his claim of self-defense. A reasonable person could conclude, as the district court did, that the substantial probative value of this evidence outweighed any minimal prejudicial effect generated by Smith's attire at the time the photographs were taken. We agree with the district judge that most jurors would hardly be shocked to learn that a murder suspect was taken into custody for some period of time, the only information communicated by jail clothing.

(4) Smith's argument that the district court erred in permitting evidence of Battle's and Scott's son's statements about an earlier incident in which Smith fired his gun also has no merit. There was no objection to the evidence of Battle's statement; Smith introduced the statement of Scott's son, thereby inviting any error; and neither mention of the incident was covered by the wording of a pretrial motion in limine.

(5) There was no error in permitting the medical examiner to characterize certain of Scott's wounds as "defensive." The admission of expert testimony lies within the sound discretion of the trial court. *Irvin v. Smith*, 272 Kan. 112, 125, 31 P.3d 934 (2001). The prosecutor laid the necessary foundation for the doctor's testimony. The doctor thoroughly explained her education, background, and teaching experience. She also explained why defensive wounds would occur on the areas of the body where they appeared on Scott.

(6) The district court also did not abuse its discretion by excluding evidence from the medical examiner regarding the amount of cocaine and alcohol in Scott's body and the re-

action or behavior such an amount would have caused. A reasonable person could agree with the district court that, because the effects of alcohol and drugs are highly individual, and because the medical examiner had no personal knowledge of Scott's particular reactions on the night of her death or at any other time, the testimony Smith sought would have been speculative and irrelevant.

(7) The district court did not err in refusing Smith's request for a voluntary intoxication instruction. The instruction would have been legally inconsistent with Smith's self-defense claim and factually inconsistent with his detailed recollection of the evening's events.

(8) Smith's argument that the evidence was insufficient to convict him of premeditated first-degree murder also fails. We will not reweigh the credibility of Scott's son on appeal. The jury heard his trial testimony and learned of the inconsistencies between that testimony and his interview with police. It was the jury's function to pass on that credibility, including whether he heard Smith announce his intention to shoot Scott. See *State v. Moore*, 269 Kan. 27, 30, 4 P.3d 1141 (2000). If that testimony is accepted as true, as our standard of review requires, it is plain the jury had ample evidence to support its finding of premeditation. See *State v. Beach*, 275 Kan. 603, Syl. ¶ 2, 67 P.3d 121 (2003). ("When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.").

(9) The district court did not err in giving an instruction dealing with an aggressor's right to claim self-defense. Some evidence of provocation is enough to support the instruction. See *State v. Adam*, 257 Kan. 693, 702-03, 896 P.2d 1022 (1995) (instruction justified although evidence of provocation by defendant slim); *State v. Hunt*, 257 Kan. 388, 394, 894 P.2d 178 (1995) ("question of whether the

defendant was an aggressor was one for the jury"); *State v. Beard*, 220 Kan. 580, 582, 552 P.2d 900 (1976) ("[w]hether defendant was an aggressor remained a question for the jury"). Here, one version of events would have supported a finding that Smith retrieved his gun when he became angry with Scott. This justified the instruction given.

(10) The district court did not err in holding it lacked jurisdiction to rule on Smith's posttrial motions. Once Smith's appeal was docketed, the district court lost jurisdiction to hear them. See *State v. Dedman*, 230 Kan. 793, Syl. ¶ 2, 640 P.2d 1266 (1982). No motion for remand to the district court had been filed.

(11) Because we find no error, Smith is not entitled to reversal for cumulative error.

We now turn to what we understand to be three additional issues Smith raises in his pro se brief.

Smith first contends that there was no probable cause for his arrest. This claim is without merit. Scott's son gave officers Smith's name and a description of his appearance and clothing. Scott's son also gave the officers Battle's address, where Smith might be found. Battle, in turn, directed the officers to Loudermilk's house, where they saw a man who matched Smith's description. Loudermilk then identified that man as Smith. Given the step-by-step strength of this evidence, it is no surprise that Smith's counsel did not bother to raise this issue before the district court or this court.

Smith next contends the State conspired against him because (1) law enforcement officers improperly coached Scott's son; (2) the prosecutor used trick photography to claim that the bullet entered from the back of Scott's head; (3) the medical examiner lied to support the State's case; (4) the record and transcripts of his trial were changed; and (5) his appointed counsel is subversively working for the State.

We find absolutely no support in the record for any of these claims and therefore hold that they neither individually nor collectively entitle Smith to relief.

Third, Smith claims that his first appellate attorney provided ineffective assistance of counsel. To establish ineffective assistance

of counsel on appeal, defendant must show "(1) counsel's perform-
ance, based upon the totality of the circumstances, was deficient
in that it fell below an objective standard of reasonableness, and
(2) the appellant was prejudiced to the extent that there is a rea-
sonable probability that, but for counsel's deficient performance,
the appeal would have been successful." *Baker v. State*, 243 Kan.
1, 7, 755 P.2d 493 (1988); accord *Maggard v. State*, 27 Kan. App.
2d 1060, 1065, 11 P.3d 89, *rev. denied* 270 Kan. 899 (2000). De-
fendant argues his attorney sabotaged his brief, claiming he helped
the State cover up alterations to the record and "left [hidden] mes-
sages that support the lie the [S]tate is telling." Again, Smith has
no support for his claim. It was not counsel's deficient or stellar
performance that dictated the outcome in this appeal. It was the
lack of quality of the issues available for argument.

Finally, Smith has also filed a "Motion For An Order For The
State To Show Cause Why All Charges Shouldn't Be Dismissed."
For all of the reasons detailed above, the motion is hereby denied.

Conviction and sentence affirmed; Motion For An Order For
The State To Show Cause Why All Charges Shouldn't Be Dis-
missed denied.