No. 98,563

CHRISTOPHER M. TROTTER, *Appellant*, v. STATE OF KANSAS,
*Appellee*.

(200 P.3d 1236)

Opinion filed January 30, 2009.

*Rebecca E. Woodman*, of Capital Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Michael A. Russell*, chief deputy district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Stephen N. Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Christopher M. Trotter appeals the district court's summary denial of his K.S.A. 60-1507 motion, raising arguments that we have grouped into two issues for purposes of our analysis.

First, may this court consider whether Trotter's convictions for capital murder and first-degree premeditated murder are multiplicitous when the issue is raised for the first time on appeal from a summary denial of a K.S.A. 60-1507 motion and, if so, grant relief? We answer this question, "yes." Under the extraordinary circumstances of this case, the defendant successfully establishes a claim of ineffective assistance of counsel for failing to raise a meritorious multiplicity issue on direct appeal, and resolution of the issue can be considered as a matter of law based upon the appellate record.

Second, did the district court err in summarily dismissing Trotter's pro se K.S.A. 60-1507 motion that claimed (a) trial counsel was ineffective for failing to request an eyewitness instruction and (b) affidavits of codefendants, in which they stated they had committed perjury, constituted newly discovered evidence warranting a new trial? We answer this question, "no." The motion, files, and records of the case conclusively show that Trotter is not entitled to relief.

### *Factual Background*

Although the facts are fully discussed in *State v. Trotter*, 280 Kan. 800, 127 P.3d 972 (2006) (*Trotter I*), a brief discussion is necessary to explain the issues in this appeal, particularly regarding those facts that relate to the issues of the eyewitness instruction and recanted testimony of two of Trotter's codefendants, Kevin Eddington and Virdal Nash.

At trial, the State presented evidence that Trotter shot and killed Traylennea Huff and James Darnell Wallace during the course of an aggravated robbery, which Trotter and others had planned in the hopes of stealing cash they believed to be in Huff's and Wal-

lace's home. Trotter's codefendants testified that Trotter, who knew the victims, approached them about the possible robbery, and the group discussed a plan to enter the home, restrain the victims, and steal the money.

In addition, the codefendants testified regarding their intrusion into the home and the events that led to Trotter's shooting of Huff and Wallace. Codefendants Michael Navarre and Eddington, both of whom had accepted the State's offer to dismiss the first-degree murder charges against them if they testified against Trotter, were at the scene of the crime throughout the incident and both provided similar, although not identical, accounts. According to their testimony, after cutting telephone wires and attempting entry into the victim's home, the group retreated to some nearby woods where they waited until Wallace came out of his home. At that point Trotter rushed Wallace. Wallace struggled with Trotter and removed a shirt Trotter had wrapped around his face as a mask.

In the meantime, Navarre and Eddington went into the home and up the stairs to a hallway where they found Huff as she was coming out of her bedroom. They put a plastic tie on Huff's wrists and asked her where the money was hidden. While they were restraining Huff, a young boy opened his bedroom door. Eddington testified he pushed the boy back into his bedroom and then took Huff into her bedroom where she said the money could be found. As Eddington and Navarre took money from under the bed, they heard a gunshot. Both Eddington and Navarre testified that they left the home immediately, leaving Huff in her room. In addition, both testified that as they came down the stairs they met Trotter as he was coming into the home and up the stairs. When Eddington and Navarre were outside running away from the home, they heard another gunshot.

Codefendant Nash, who also received a favorable plea arrangement in exchange for his testimony, testified he went with the others to the scene, left while the group was waiting in the woods before the home invasion, and returned just as the others were fleeing the home. According to Nash, Eddington told him that Trotter had shot Wallace and Huff. Nash also testified that he

heard Trotter say: "All he had to do was just lay down. I wouldn't have had to kill him."

In addition, Huff and Wallace's 8-year-old son, Damante, testified to what he saw and heard when noises woke him during the encounter. Among other things, Damante testified he got up from his bed, looked out of his bedroom door, and was pushed back into his room by a man who was in the hallway with his mother. Damante testified he returned to his bed but could still see out of his room. He was aware of the movement of two people at the top of the stairs, and he knew one of the people was his father because he heard his father say, "Chris." Soon thereafter, Damante heard gunshots.

Damante's ability to identify Trotter as the "Chris" who was at the scene of the crime was a point of contention during Trotter's trial. The jury heard of several occasions when Damante was asked to identify Trotter. The first occurred a day or two after the murder when police showed Damante a picture of Trotter. Damante identified the person as "Rock" and told police he had not seen "Rock" during the incident. Then, several months later, Damante was again shown Trotter's picture and on this occasion he stated, "That kind of looks like the one that was in our house." Finally, during his trial testimony, Damante was asked if he knew anyone in the courtroom; he responded that Trotter was the "Chris" he knew. On cross-examination, Damante testified that the "Chris" he was identifying was the person who had pushed him back into his room.

In the defense's closing argument, counsel argued that Damante's identification of Trotter as the person in the home was a product of suggestion. Defense counsel bolstered that argument by pointing to Damante's inability to identify Trotter's photograph a day or two after the shooting and to Damante's growing confidence in his identification as the prosecution progressed. In addition, defense counsel focused on Damante's identification of Trotter as the person who shoved him. Counsel emphasized that this testimony was inconsistent with Eddington's testimony that Eddington was the one who had pushed the boy, it created a doubt as to whether Trotter was the shooter, and it allowed an inference

that Eddington was the one who had actually fired the shots that killed Wallace and Huff.

The State, on the other hand, noted that Damante had testified that the person who pushed him was wearing latex gloves. All of the codefendants testified that Trotter wore baseball batting gloves while they wore latex gloves. The State also emphasized that in Damante's initial contact with police, which occurred shortly after the incident, Damante told them his father's friend "Chris" was involved. It was this immediate statement that caused police to ask Wallace's family if Wallace knew a "Chris," and their responses led police to Trotter. In addition, the State emphasized that the other evidence—which was primarily the testimony of the codefendants—pointed to Trotter as the shooter.

No physical evidence linked Trotter directly to the crime, although physical evidence did corroborate that the shots that killed both victims were fired from one gun, the gun which the codefendants testified was in Trotter's hands the entire time.

After hearing this testimony and the other evidence more fully described in *Trotter I*, 280 Kan. 800, the jury found Trotter guilty of the capital murder of Huff, the first-degree premeditated murder of Wallace, aggravated robbery, and conspiracy to commit aggravated robbery. The jury also considered whether to impose the death penalty and decided not to do so. Subsequently, the district court sentenced Trotter to concurrent sentences of life for each murder conviction without eligibility for parole for 50 years, 79 months for the aggravated robbery conviction, and 32 months for the conspiracy conviction.

On direct appeal, Trotter raised issues involving (1) the district court's failure to give an unrequested instruction on eyewitness identification, (2) the court's admission of evidence that Huff was pregnant at the time of the murders, (3) the State's use of peremptory challenges to eliminate 9 of the 10 African-American jurors from the venire panel, and (4) the sufficiency of the evidence to support his convictions for capital murder and first-degree premeditated murder. *Trotter I*, 280 Kan. 800. This court rejected Trotter's contentions and upheld his convictions.

Less than 1 year later, Trotter filed a pro se K.S.A. 60-1507 motion claiming (a) ineffective assistance of trial counsel for failing to request an eyewitness jury instruction and (b) newly discovered evidence involving recanted testimony of witnesses. Attached to the motion were affidavits from codefendants Nash and Eddington, each attesting that their testimony against Trotter was untrue.

Nash began his affidavit by stating: "With this letter I do solemnly affirm that the statement I made in my *preliminary hearing* against myself and co-defendants Christopher Trotter, Kevin Eddington, Micheal [*sic*] Navarre and James Trotter was made up and un-true." (Emphasis added.) He indicated the police showed him pictures of the crime scene, "facts and points and a run down of the statements made by Kevin and Michael." Nash attested he "took the facts [the police] showed me and the run down from the previous statements made and came up with a believable statement." He also stated repeatedly that he was not there, concluding his affidavit by stating he had

"no first hand account of what took place that day of this crime or any role or roles taken place by Chris Trotter, Mr. Eddington or Mr. Navarre.

"I simply was not there! And I am only a pawn used by the D.A. because I'm a relative [of Trotter's] and would be a convincing argument for her case."

Eddington's affidavit was shorter, stating:

"I[,] Kevin Eddington[,] being of sound mind, swear that the statement I made against Christopher Trotter at his trial was untrue! It was made clear to me by the police and D.A. that the only person they wanted was Christopher Trotter! As I have always stated from the beganing [*sic*] before I made any statement the police made it clear that Chris Trotter had to be the the [*sic*] master mind behind this whole crime! So I made my statement and testmonies [*sic*] match up to what they wanted to hear!"

After reviewing these filings, the district court summarily denied Trotter's K.S.A. 60-1507 motion without appointing counsel or conducting an evidentiary hearing. In a memorandum decision, the district court first addressed Trotter's claim that his counsel was ineffective because an eyewitness instruction was not requested. The district court pointed out that this court in *Trotter I* had found no error in the trial court's failure to give an eyewitness instruction. Consequently, the district court found that Trotter's trial counsel

did not provide ineffective assistance on the matter. With respect to the claim of newly discovered evidence and the affidavits of Nash and Eddington, the court stated:

"Nash's affidavit reiterates his testimony at trial that he was not present when these homicides took place and has no first hand knowledge of them. Eddington's affidavit states that 'the statement I made' against petitioner at trial was untrue. Eddington testified at length during petitioner's trial, and he is not specific regarding the 'statement' to which he refers. Neither affidavit provides a basis upon which relief could be granted."

Now, Trotter appeals from the district court's summary denial of his K.S.A. 60-1507 motion. This court has jurisdiction over the appeal under K.S.A. 22-3601(b)(1) (life sentence; off-grid crime).

### 1. Multiplicity

Trotter contends his conviction for one count of capital murder and one count of first-degree premeditated murder—convictions which arose out of the double homicide—are improperly multiplicitous and, therefore, his first-degree premeditated murder conviction must be reversed. This issue is being raised for the first time on appeal.

In making the argument, Trotter notes the manner in which the State pled the count of capital murder under K.S.A. 21-3439(a)(6), the intentional and premeditated killing of more than one person. The State alleged that Trotter did

"unlawfully, feloniously, and intentionally and with premeditation, kill a human being, to-wit: Traylennea Huff, which constituted the killing of more than one person as a part of the same act or transaction or in two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct, in violation of K.S.A. 21-3439."

Trotter argues this count required proof of the premeditated murder of more than one person, meaning the State was required to prove the same elements as in the first-degree murder count, which alleged the premeditated murder of Wallace.

He points to the jury instructions for further support. The jury was instructed that one of the elements to be proved in the capital murder charge was that "the premeditated and intentional killing of Traylennea Huff and James Wallace were part of the same act

or transaction or in two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct." The jury was also instructed that first-degree premeditated murder is a lesser included offense of capital murder and was given the option of finding Trotter guilty of the first-degree premeditated murder of Huff.

Although Trotter does not object to the manner in which the charge was pled or to the instructions, he argues the first-degree premeditated murder of Wallace—which was charged as a separate count—was also a lesser included offense of the capital-murder charge. As a result, he suggests his conviction for the first-degree premeditated murder of Wallace must be reversed because K.S.A. 21-3107(2) provides a "defendant may be convicted of either the crime charged or a lesser included crime, *but not both.*" (Emphasis added.)

In presenting this argument in his appellant's brief, Trotter relies primarily upon this court's decision in *State v. Martis*, 277 Kan. 267, Syl. ¶ 1, 83 P.3d 1216 (2004). In *Martis*, the defendant was charged with capital murder under K.S.A. 21-3439(a)(6), the intentional and premeditated killing of more than one person. The district court gave lesser included instructions of first-degree premeditated murder, as defined by K.S.A. 21-3401(a), relating to both victims, and Martis was convicted on both lesser included offenses. On appeal, Martis argued he could not be convicted of two lesser included offenses arising from one charged count. This court disagreed and approved the instructions holding that a district court "is required to give lesser included instructions for each victim set forth in the capital-murder charge." 277 Kan. 267, Syl. ¶ 2. Applying *Martis'* holding that the first-degree murder was a lesser offense, Trotter invokes the prohibition in K.S.A. 21-3107(2) against convictions for both the crime charged and a lesser included offense.

Subsequently, in a letter of additional authority filed pursuant to Supreme Court Rule 6.09 (2008 Kan. Ct. R. Annot. 47), Trotter cited *State v. Scott*, 286 Kan. 54, 183 P.3d 801 (2008), which raised the same issue as we consider here, but under a previous version of K.S.A. 21-3107. The statute, as considered in *Scott,* stated:

"Upon prosecution for a crime, the defendant may be convicted of either the crime charged or an included crime, but not both. An included crime may be any of the following:

"(a) A lesser degree of the same crime;

"(b) an attempt to commit the crime charged;

"(c) an attempt to commit a lesser degree of the crime charged; or

"(d) a crime necessarily proved if the crime charged were proved." K.S.A. 21-3107(2) (Furse).

Scott based his argument on the "necessarily proved" language of K.S.A. 21-3107(2)(d) (Furse), which was deleted from the statute effective July 1, 1998. L. 1998, ch. 185, sec. 1.

The State in *Scott* did not dispute that the first-degree murder of more than one victim must be necessarily proved in order to prove capital murder, and this court accepted that conclusion. Consequently, the focus of this court's analysis was on whether the conviction for first-degree murder must be reversed. We explained:

"Although multiple punishments for the same crime are constitutionally prohibited, this prohibition extends only to prevent a sentencing court from prescribing greater punishments than the legislature intended. [Citations omitted.] The Double Jeopardy Clause is not violated where the legislature specifically authorizes cumulative punishment under two statutes for the same offense. [Citation omitted.]

"The issue is whether the Kansas Legislature intends cumulative punishment for capital murder under K.S.A. 21-3439(a)(6) and first-degree premeditated murder under K.S.A. 21-3401(a). We conclude the answer is 'no.' " 286 Kan. at 65-66.

In reaching the conclusion the legislature did not intend cumulative punishment, we examined various Kansas statutes and cases from Virginia, noting that the relevant portion of the Kansas Death Penalty Act, K.S.A. 21-3439(a)(6), is patterned after a similar provision in the Virginia Death Penalty Act and, therefore, Virginia precedent could reflect the Kansas Legislature's intent. After discussing these authorities, we stated:

"We are unable to conclude from a plain reading of K.S.A. 21-3439(a)(6) and its legislative history that the legislature intended to override the acknowledged reach of K.S.A. 21-3107(2)(d). In other instances, the legislature has not hesitated to state when K.S.A. 21-3107(2) is not to be applied. See K.S.A. 21-3436 (precluding application of K.S.A. 21-3107[2] to specific felony offenses regardless of whether such felony is distinct from the alleged homicide). Here, there has been no such

declared legislative intent. Accordingly, we conclude Scott's conviction for the first-degree premeditated murder of [the victim in the noncapital count] must be reversed." 286 Kan. at 68.

Trotter asserts that *Scott* controls, and his conviction for the first-degree murder of Wallace must also be reversed.

Application of *Scott* to this case is not as straightforward as Trotter suggests, however, because there are two potential distinctions. First, the "necessarily proved" language relied upon in *Scott* had been deleted from K.S.A. 21-3107 before Huff and Wallace were murdered. Second, Scott raised the multiplicity issue before trial and again on direct appeal. 286 Kan. at 62, 65. In contrast, Trotter raises the issue for the first time in this appeal from a summary denial of a K.S.A. 60-1507 motion.

Regarding the first potential distinction, the determination of whether the first-degree murder of Wallace was a lesser included offense must be determined by the statute in effect at the time Huff and Wallace were murdered. That version of the statute, which is still in effect, states:

"(2) Upon prosecution for a crime, the defendant may be convicted of either the crime charged or a lesser included crime, but not both. A lesser included crime is:

"(a) A lesser degree of the same crime;

"(b) a crime where all elements of the lesser crime are identical to some of the elements of the crime charged;

"(c) an attempt to commit the crime charged; or

"(d) an attempt to commit a crime defined under subsection (2)(a) or (2)(b)." K.S.A. 21-3107(2).

Because this provision does not include the "necessarily proved" language relied upon in *Scott*, that decision does not control the question of whether Trotter's first-degree premeditated murder conviction was a lesser included offense of the capital-murder conviction.

This question is answered by the decision in *Martis*, however, which held that first-degree premeditated murder was a lesser included offense of capital murder by application of K.S.A. 21-3107(2)(b), "a crime where all elements of the lesser crime are

identical to some of the elements of the crime charged." *Martis*, 277 Kan. at 276.

Given that *Martis* establishes that Trotter's first-degree premeditated murder conviction is a lesser included offense of his capital-murder conviction, the remainder of the *Scott* analysis of this issue applies: K.S.A. 21-3439(a)(6) does not express a legislative intent contrary to that expressed in K.S.A. 21-3107(2), which unambiguously states a defendant may not be convicted of both a charged crime and a lesser included offense. Hence, under *Martis* and *Scott*, Trotter's two convictions arising out of the double homicide, one for capital murder based upon the intentional and premeditated killing of more than one person under K.S.A. 21-3439(a)(6) and the other for first-degree premeditated murder under K.S.A. 21-3401(a) of one of those victims, are improperly multiplicitous.

The other potential distinction is that Scott raised the multiplicity issue before his trial and again on direct appeal. In this case, the issue was not raised during the trial proceedings, on direct appeal, or during the district court proceedings on the K.S.A. 60-1507 motion. Generally, issues not raised before a district court, including constitutional grounds for reversal, cannot be raised for the first time on appeal. See *State v. Gaudina*, 284 Kan. 354, 372, 160 P.3d 854 (2007); *State v. Shopteese*, 283 Kan. 331, 339, 153 P.3d 1208 (2007).

Acknowledging this general rule and recognizing the procedural difficulties of raising an issue for the first time on appeal,.Trotter maintains (a) his sentences are "illegal" because the trial court lacked jurisdiction to permit the convictions of both capital murder and first-degree premeditated murder for the double homicide and (b) alternatively, exceptional circumstances exist that excuse Trotter's failure to raise the issue on direct appeal. Based on these arguments, Trotter contends he is entitled to bring a request for relief.

Trotter's arguments and our analysis require us to consider several exceptions to the general rule that an issue cannot be considered for the first time on appeal. These exceptions have developed into at least the following three general categories that are relevant to our discussion: (1) those which apply to direct appeals in civil

and criminal cases generally; (2) those which apply to claims of an illegal sentence; and (3) those which apply to issues raised in K.S.A. 60-1507 proceedings.

The first category of general exceptions relating to direct appeals appears to have been synthesized into a partial list in *Pierce v. Board of County Commissioners*, 200 Kan. 74, 80-81, 434 P.2d 858 (1967). There the court recognized three situations where an issue, including a constitutional issue, could be presented for the first time on direct appeal: (1) The newly asserted theory involves only a question of law arising on proved or admitted facts and the issue is finally determinative of the case; (2) resolution of the question is necessary to serve the ends of justice or to prevent denial of fundamental rights; or (3) the district court reached the right conclusion but relied on the wrong ground or assigned a wrong reason for its decision. The *Pierce* exceptions have been frequently cited in subsequent cases. See, *e.g., State v. Ortega-Cadelan*, 287 Kan. 157, Syl. ¶ 1, 194 P.3d 1195 (2008).

However, as Trotter notes, there are other exceptions, including one allowing an issue relating to the court's subject matter jurisdiction to be raised at any time. *Vorhees v. Baltazar*, 283 Kan. 389, 397, 153 P.3d 1227 (2007). Under this line of cases, it is held that a party does not waive jurisdictional defects by failing to object to the procedure in district court. *Mid-Continent Specialists, Inc. v. Capital Homes*, 279 Kan. 178, 185, 106 P.3d 483 (2005).

Applying these general exceptions, we have allowed multiplicity issues to be raised for the first time on direct appeal, noting that the question raises an issue of law and implicates double jeopardy, a fundamental right. *E.g., State v. Nguyen*, 285 Kan. 418, 433, 172 P.3d 1165 (2007); *State v. Walker*, 283 Kan. 587, 609, 153 P.3d 1257 (2007); *State v. Dubish*, 234 Kan. 708, 718, 675 P.2d 877 (1984).

When, as here, a multiplicity issue is raised in a K.S.A. 60-1507 motion, however, a movant must also show exceptional circumstances excusing the failure to raise the issue on direct appeal. Supreme Court Rule 183(c) (2008 Kan. Ct. R. Annot. 247) ("Mere trial errors are to be corrected by direct appeal, but trial errors affecting constitutional rights may be raised [in a K.S.A. 60-1507

motion] even though the error could have been raised on appeal, provided there were exceptional circumstances excusing the failure to appeal."); *Pabst v. State*, 287 Kan. 1, 6, 192 P.3d 630 (2008) (K.S.A. 60-1507 action cannot be used as a substitute for an appeal of trial errors).

### a. Jurisdiction

Although Trotter presents an argument of exceptional circumstances as an alternative, he first attempts an end run around the exceptional circumstances requirement by suggesting his sentence was illegal and, even though this action is brought as a K.S.A. 60-1507 action, should be treated as a motion to correct an illegal sentence under K.S.A. 22-3504(1). K.S.A. 22-3504(1) creates a remedy for an illegal sentence, stating: "The court may correct an illegal sentence at any time." An "illegal sentence" has been defined by case law to mean a "sentence imposed by a court without jurisdiction; a sentence which does not conform to the statutory provision, either in the character or the term of the punishment authorized; or a sentence which is ambiguous with respect to the time and manner in which it is to be served." *State v. Edwards*, 281 Kan. 1334, 1336, 135 P.3d 1251 (2006).

In addition, Trotter cites the general authorities holding that subject matter jurisdiction may be raised at any time and that a party does not waive jurisdictional defects by not objecting to the procedure in district court. See *Vorhees*, 283 Kan. at 397; *Mid-Continent Specialists, Inc.*, 279 Kan. at 185.

Nevertheless, we need not determine the merits of Trotter's attempt to assert a jurisdiction argument for the first time on appeal from the denial of a K.S.A. 60-1507 motion because in *Edwards*, 281 Kan. 1334, we rejected the premise of Trotter's argument.

In *Edwards*, we noted that jurisdiction is acquired in a criminal case upon the filing or amendment of a complaint, indictment, or information, and K.S.A. 21-3107(2) does not bar the *charging* of multiplicitous offenses. Rather, it defines the *remedy* if a defendant is *convicted* of multiplicitous offenses by providing that only one conviction may stand. 281 Kan. at 1338-39. Applying this reasoning, we held: "We therefore conclude a claim that sentences are

multiplicitous is not a claim that the sentences were imposed by a court without jurisdiction as is necessary to come within the narrow definition of illegal sentence under K.S.A. 22-3504(1)." 281 Kan. at 1341.

The holding in *Edwards* controls this issue and requires us to reject Trotter's argument that the district court lacked jurisdiction.

### b. Ineffective Assistance of Counsel

In the alternative, Trotter contends the ineffectiveness of his first appellate counsel, as evidenced by counsel's failure to raise a meritorious multiplicity issue on direct appeal, is an exceptional circumstances excusing his failure to raise the issue on direct appeal.

Indeed, we have determined that a K.S.A. 60-1507 movant can overcome the failure to raise an issue at trial or on direct appeal and demonstrate exceptional circumstances by persuading a court that there was ineffective assistance of trial counsel in failing to object regarding an issue; there was ineffective assistance of direct appeal counsel in failing to raise an issue; or there was newly discovered evidence or an unforeseeable change in circumstances or constitutional law unknown to counsel and movant at the time of the trial and direct appeal. *Bledsoe v. State*, 283 Kan. 81, 88-89, 91, 150 P.3d 868 (2007).

The first two of these exceptions would have allowed Trotter's argument to have been raised before the district court in his K.S.A. 60-1507 motion because he alleges ineffective assistance of counsel in failing to raise the multiplicity issue at trial or in his direct appeal, although he focuses upon the appeal. However, these exceptions do not determine, at least by themselves, whether an appeal from the denial of a K.S.A. 60-1507 motion can be used as a platform for discussing an entirely new issue premised upon allegations of ineffective assistance of counsel, even if the issue could have been raised before the district court.

On several occasions, we have considered whether the exceptions relating to ineffective assistance of counsel can be applied when raised for the first time on appeal, and, as a general rule, we have concluded the exception cannot be applied. See, *e.g.*, *State v. Gleason*, 277 Kan. 624, Syl. ¶ 5, 88 P.3d 218 (2004). Rather, we

have generally determined a district court must consider the evidence to determine the two-prong test for establishing ineffective assistance of counsel, which requires a defendant to "show '(1) counsel's performance, based upon the totality of the circumstances, was deficient in that it fell below an objective standard of reasonableness, and (2) [defendant] was prejudiced to the extent that there [was] a reasonable probability [of success], but for counsel's deficient performance.' [Citations omitted.]" *State v. Smith*, 278 Kan. 45, 51-52, 92 P.3d 1096 (2004); see *Bledsoe*, 283 Kan. at 90-91. In most cases, we would remand to the district court for an evidentiary hearing on at least the first prong of the ineffective assistance of counsel standard. See, *e.g., Lujan v. State*, 270 Kan. 163, 14 P.3d 424 (2000); *State v. Van Cleave*, 239 Kan. 117, 119-21, 716 P.2d 580 (1986).

We have rarely found an exception to the general rule that an ineffective assistance of counsel claim should be first considered by the district court, but did so on at least one occasion in *Laymon v. State*, 280 Kan. 430, 444, 122 P.3d 326 (2005), under circumstances we recently labeled "extraordinary." *State v. Swisher*, 281 Kan. 447, 450, 132 P.3d 1274 (2006). In our decision in *Laymon*, we held that the two prongs of ineffective assistance—deficient performance by counsel and prejudice as a result of the deficiency—were demonstrated as a matter of law by the appellate record and, therefore, remand to the district court was not necessary.

*Laymon* presented such a circumstance because the appellate counsel failed to raise a sentencing argument on direct appeal, even though counsel's colleague from the Kansas Appellate Defender office (ADO) was simultaneously, and successfully, pursuing that argument in another case. 280 Kan. at 444. In recognizing an exception to the general rule, we stressed that the failure of appellate counsel to raise an issue on appeal is not, per se, ineffective assistance of counsel. 280 Kan. at 439. It was only the circumstance of timing and imputed knowledge of other attorneys working for the ADO that led us to the extraordinary result, one which could be reached because there were no factual issues and the two-prong

ineffective assistance of counsel test could be applied as a matter of law based upon the appellate record.

Trotter argues a similar circumstance exists in his case. According to Trotter, because of this court's holding in *Martis*, his appellate counsel on direct appeal—who was the same counsel as had argued the appeal in *Martis*—knew that Trotter was convicted of one count of the greater offense (capital murder) and one count of the lesser included offense (first-degree premeditated murder) for a double homicide. This knowledge, according to Trotter, should have been enough to cause his appellate counsel to raise the issue of multiplicity on direct appeal and to argue that under K.S.A. 21-3107(2) a defendant "may be convicted of either the crime charged or a lesser included crime, but not both."

In considering this argument, we note that the authorities necessary to make this argument were available to Trotter's appellate counsel. *Martis* was decided after Trotter's direct appeal was docketed but before his brief was filed. (Trotter was convicted in 2003, the decision in *Martis* was filed on February 6, 2004, Trotter's brief on direct appeal was filed 10 months later on December 7, 2004, and the decision in *Trotter I* was filed February 3, 2006.) Thus, the arguments and holding in *Martis* were known to the appellate counsel who had just concluded the appeal in *Martis* and was preparing the brief in Trotter's appeal.

Unlike the situation in *Laymon*, however, the argument counsel had advanced in *Martis* was not the same argument as Trotter wishes had been advanced in his direct appeal. In *Martis*, the defendant claimed a due process violation because he was convicted and sentenced for two first-degree premeditated murders arising as lesser included offenses of the one count of capital murder that had been charged. 277 Kan. at 274. Nevertheless, Trotter is correct that his counsel had knowledge of this court's holding that the first-degree premeditated murder of both victims were lesser included offenses of the capital-murder charge.

In addition, by the time Trotter's brief was filed in his direct appeal, other attorneys in the Capital Appellate Defender office had made the argument that a defendant could not be convicted of both capital murder and the first-degree premeditated murder

of one of the victims when they filed the defendant's brief in *State v. Scott* on March 8, 2002. The brief in *Scott* was filed even before Trotter committed his crimes, and that case was still pending at the time of Trotter's direct appeal. As we have discussed, although the basis for Trotter's and Scott's arguments as to why the premeditated offense should have been considered a lesser included offense differed, the premise—that the offense was a lesser included offense and a defendant could not be convicted of both the charged crime and the lesser crime—was the same. This court's decision in *Scott* did not depend on any authorities not available at the time Trotter's briefs were filed in his direct appeal.

Hence, as in *Laymon*, other attorneys from the Appellate Defender office were simultaneously and successfully appealing the issue that could have been, but was not, raised in a direct appeal. Because there was no intervening authority affecting the outcome in *Scott*, it is as likely that the same double jeopardy argument that succeeded at the time of Scott's direct appeal would have succeeded at the time of Trotter's direct appeal. In these circumstances of timing, imputed knowledge of attorneys, and existence of necessary precedent, Trotter's situation is like that presented in *Laymon*.

Even so, in *State v. Swisher*, 281 Kan. 447, we concluded the confluence of the circumstances of timing and imputed knowledge did not allow this court to grant relief where the issue was raised for the first time on appeal. For our purposes it is important to note that this court did not conclude that the failure to raise the issue in the district court was an absolute procedural bar; rather, the court remanded the case to the district court for an evidentiary hearing after determining the ineffective assistance of counsel issue could not be considered as a matter of law. Remand was determined to be necessary because questions existed as to whether counsel's decision to not raise the issue could have been strategic and as to whether the argument had the same likelihood of success as it had in the later case because there had been intervening appellate authority.

A remand is not necessary in this case, however, because *Swisher*'s distinguishing features do not apply. First, there has been

no suggestion that a strategic reason might explain the failure to raise the multiplicity issue. Second, as previously discussed, there was no intervening appellate authority between Trotter's direct appeal and the appeal in *Scott* where the same issue was successfully argued; hence, the probability of success in Trotter's direct appeal was as strong as it was in Scott's direct appeal.

In other words, as in *Laymon*, the determination of whether counsel was ineffective can be determined as a matter of law based upon the appellate record, and remand to the district court is not necessary. In addition, the second prong of the ineffective assistance of counsel test—prejudice—is met because the multiplicity issue is meritorious and would result in the reversal of a conviction.

Hence, we conclude that the failure of Trotter's counsel on direct appeal to raise the multiplicity argument, an argument based upon authorities available to counsel at the time of the direct appeal and related to arguments that appellate counsel or his colleagues had made on behalf of other defendants, creates an exceptional circumstance allowing Trotter to raise the issue for the first time on appeal from the denial of his K.S.A. 60-1507 motion.

As a result, Trotter is entitled to relief pursuant to the holdings in *Scott* and *Martis*. We hold that Trotter's convictions for capital murder and first-degree premeditated murder are multiplicitous, and Trotter's first-degree premeditated murder conviction of Wallace is reversed.

## 2. Issues Raised Before District Court

Next, Trotter argues the district court erred by summarily denying his K.S.A. 60-1507 motion. His motion alleged that the trial court erred in failing to give an eyewitness instruction and in failing to grant a new trial based upon newly discovered evidence. Trotter contends the court should have first appointed counsel and conducted an evidentiary hearing.

"[A] movant has the burden to prove his or her K.S.A. 60-1507 motion warrants an evidentiary hearing; the movant must make more than conclusory contentions and must state an evidentiary basis in support of the claims or an evidentiary basis must appear

in the record." *Swenson v. State,* 284 Kan. 931, 938, 169 P.3d 298 (2007).

In assessing whether this burden has been met, a district court has three options which were explained in *Lujan,* 270 Kan. at 170-71. First, the court may determine that the motion, files, and records of the case conclusively show that the movant is entitled to no relief and summarily deny the movant's motion. Second, the court may determine from the motion, files, and record that a substantial issue or issues are presented, requiring a full evidentiary hearing with the presence of the movant. Finally, the court may determine that a potentially substantial issue or issues of fact are raised in the motion, supported by the files and record, and hold a preliminary hearing after appointment of counsel to determine whether in fact the issues in the motion are substantial. In the event the court determines that the issue or issues are not substantial, the court may move to a final decision without the presence of the movant. If the issue or issues are substantial, involving events in which the movant participated, the court must proceed with a hearing in the presence of the movant.

In this case, the district court followed the first avenue of approach by summarily dismissing Trotter's K.S.A. 60-1507 motion without conducting a hearing. The standard of review for the summary dismissal of K.S.A. 60-1507 motions is de novo, requiring an appellate court to determine whether the motion, files, and records of the case conclusively show that the movant is entitled to no relief. *Bellamy v. State,* 285 Kan. 346, 354, 172 P.3d 10 (2007).

### a. Eyewitness Instruction

As one claim for relief in Trotter's pro se K.S.A. 60-1507 motion, he asserted ineffective assistance of trial counsel for failing to request an eyewitness jury instruction.

As previously discussed, to obtain a reversal of a conviction based upon ineffective assistance of trial counsel, a defendant must establish that counsel's performance was constitutionally deficient, which requires a showing that counsel made errors so serious that his or her performance was less than that guaranteed to the defendant by the Sixth Amendment to the United States Constitu-

tion, and that counsel's deficient performance prejudiced the defense, which requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial. *Pabst*, 287 Kan. at 16; *Bledsoe*, 283 Kan. at 90.

The district court, in its memorandum decision, rejected Trotter's claim of ineffective assistance of trial counsel, finding that Trotter did not establish the first prong of the test. The district court found counsel's performance was not deficient, stating that "the record reflects [trial counsel] did request [an eyewitness identification] instruction, but the Court refused to so instruct the jury." As Trotter points out, this finding is inaccurate. At trial, Trotter requested a jury instruction on credibility of witnesses, not eyewitness identification. See *Trotter I*, 280 Kan. 800, 805, 127 P.3d 972 (2006). As a consequence, on direct appeal, this court applied the clearly erroneous standard and determined the failure to give an eyewitness jury instruction was not erroneous. 280 Kan. at 806, 809.

In this appeal, Trotter observes that if the instruction had been requested he would not have had to meet the more burdensome clearly erroneous standard. See *State v. Edgar*, 281 Kan. 47, 54, 127 P.3d 1016 (2006) (requested instruction should be granted if evidence supports giving of instruction; reversible error only if instructions as whole do not fairly and properly state law and would have misled jury). Trotter suggests his counsel's performance must be considered deficient because he would have been successful in establishing error on appeal if a lower standard of appellate review had applied.

Even if we assume the validity of this argument, Trotter must meet the second prong of the ineffective assistance of counsel test and establish that counsel's deficiency was so serious it deprived Trotter of a fair trial. In *Trotter I*, the court indirectly answered whether this prong could be satisfied when, as an alternative to its finding that there was no error, it considered whether the failure to give the eyewitness instruction was reversible if it was assumed there had been error. The *Trotter I* court stated:

"To establish reversible error, Trotter must demonstrate that there is a real possibility that the jury would have rendered a different verdict if the trial court

had given the eyewitness identification instruction from PIK Crim. 3d 52.20. [Citation omitted.] Trotter has failed to make that showing. His trial counsel actively pursued Damante's in-court identification, knowing that it would be contradicted by Eddington's testimony. Trotter's counsel also thoroughly attacked Damante's identification, highlighting Damante's inability to identify Trotter the day after his parents were murdered. Here Damante was familiar with Trotter, and his identification was thoroughly challenged during the trial; there is no possibility that the jury would have returned a different verdict if the eyewitness identification instruction had been given. Therefore, the trial court did not err by not giving the unrequested eyewitness instruction." 280 Kan. at 809.

These conclusions control the question of whether trial counsel's performance in failing to request an eyewitness instruction was so serious as to deprive Trotter of a fair trial. Trotter cannot establish the prejudice prong of the ineffective counsel test, and the district court did not err in summarily dismissing his claim.

### b. Newly Discovered Evidence

In addition, Trotter claims the district court erred in summarily denying his request for a new trial in light of newly discovered evidence. Again, because the issue arises in the context of a summary denial in a K.S.A. 60-1507 proceeding, our standard of review is de novo. See *Bellamy*, 285 Kan. at 354.

This request for relief is based upon the two affidavits of Trotter's codefendants which Trotter attached to his K.S.A. 60-1507 motion. As previously noted, the district court determined Nash's affidavit did not add anything to his testimony. At trial, Nash testified he left the scene before the crimes were committed and did not observe the shootings; the district court noted that Nash's affidavit did not change this testimony. Regarding Eddington's affidavit, the district court observed that Eddington had testified extensively, making it impossible to determine specifically what Eddington is referring to in his affidavit when he stated "the statement I made" against Trotter at trial was untrue.

In essence, the district court determined Trotter had not met his burden of establishing his right to an evidentiary hearing but had made only conclusory allegations. If we examine Trotter's motion in isolation without considering the affidavits, we agree.

Trotter used the form for K.S.A. 60-1507 motions that is sanctioned by Supreme Court Rule 183(e) (2008 Kan. Ct. R. Annot. 247) ("A motion to vacate a sentence shall be deemed sufficient if in substantial compliance with the form set forth by the judicial council."). Despite using the form, Trotter did not complete it. He did set out his general allegations in paragraph 10 of the form, which reads: "State concisely all the grounds on which you base your allegation that you are being held in custody unlawfully." Trotter stated: "(a) Perjury Testimony, (b) Recantation of Testimony," [and] "(c) Ineffective Assistance of Counsel." But he failed to add any facts or an evidentiary basis in paragraph 11, which reads: "State concisely and in the same order the facts which support each of the grounds set out in (10), and the names and addresses of the witnesses or other evidence upon which you intend to rely to prove such facts:" Trotter left the space below this statement completely blank. Clearly, without the required specifics, Trotter's motion is conclusory and inadequate, and based upon the motion alone, Trotter did not meet his burden.

Nevertheless, we must consider the affidavits, which were attached to the motion and which provide some additional specificity. Trotter argues these affidavits were sufficient to require a determination that he is entitled to an evidentiary hearing. He cites the decision of *Rodgers v. State*, 197 Kan. 622, 419 P.2d 828 (1966), as authority for his argument. In *Rodgers*, the court described the motion it was considering as follows:

"The present motion to vacate was prepared and filed by retained counsel for petitioner and follows the form prescribed by the court under Rule No. 121(*e*) (194 Kan. XXVII). As incredible as it may seem petitioner sets out in his motion certain definite allegations of fact and the names and addresses of seven witnesses from whom the court may ascertain the truth of his statements. He alleges that while he and a codefendant stood charged with first-degree murder, the officers managed to procure the codefendant as a witness for the prosecution upon the promise and assurance of leniency; that his conviction was obtained largely upon the false testimony of this codefendant; that the prosecuting attorney knew this testimony was false at the time it was given; that after petitioner was convicted the charge against this codefendant was reduced from first-degree murder to a charge of being an accessory to manslaughter in the third degree; and that upon a plea of guilty to the amended information this codefendant was sentenced to not more than three years. Petitioner further alleges this codefendant later signed

a written statement admitting that his testimony was false and was given by him at the trial upon promises and assurances of leniency by the prosecuting attorney." 197 Kan. at 623.

In reversing the summary dismissal of the motion, this court noted that petitioner had made "specific and detailed factual assertions." 197 Kan. at 625. While the court viewed these assertions as "improbable, at this juncture [they] cannot be said to be incredible when supported in some manner by a written statement of a codefendant. If the allegations are true the petitioner is clearly entitled to relief." 197 Kan. at 625.

Trotter argues the same conclusions apply to the affidavits he submitted as support for his petition, and he is correct that his codefendants' affidavits have characteristics similar to the allegations mentioned in *Rodgers*. Each attested his statements were procured upon promises of leniency and that he made his statements meet the version of facts suggested by detectives.

Nevertheless, this issue is presented in a different posture than it was presented in *Rodgers*, where the pleading referred to a written statement of the codefendant. The *Rodgers* court suggested that "[t]he contents of the written statement would seem to be of sufficient importance to require its production." 197 Kan. at 625. Consequently, the court remanded the case with directions that the district court conduct a preliminary hearing to obtain the written statement. The district court was instructed to review the statement to determine if an evidentiary hearing was necessary. The court continued, noting:

"Not every colorable allegation entitles a prisoner to a trip to the sentencing court. If it shall appear at a pretrial conference or upon any other proceeding before the court that the petitioner's statements are uncorroborated then such uncorroborated statements of the petitioner could very well be found insubstantial and insufficient to justify the production of the prisoner at a full plenary hearing." 197 Kan. at 625.

Here, we have the written statements—the codefendants' affidavits. Consequently, the district court could and, now, this court can examine whether the witnesses' statements provide the support necessary for Trotter to meet the burden of establishing a right to an evidentiary hearing.

In cases subsequent to *Rodgers*, this court has explained that an evidentiary hearing is not justified unless the altered testimony is material and would cause the exoneration of the K.S.A. 60-1507 movant. *E.g., Potts v. State*, 214 Kan. 369, 520 P.2d 1259 (1974). Thus, even in circumstances where an affidavit of the witness or an offer of proof has been presented showing a change in the witness' testimony, a denial of the motion without an evidentiary hearing has been upheld on appeal if the alleged perjury does not establish that the testimony would have entitled the movant to relief. *E.g., Sullivan v. State*, 222 Kan. 222, 223, 564 P.2d 455 (1977) (petitioner failed to meet burden when "[n]o facts were set forth which indicated the nature of the perjury"); *Van Bebber v. State*, 220 Kan. 3, 4, 551 P.2d 878 (1976) ("A 1507 movant must allege facts which, if true, would entitle him to relief. . . . Even if true, the movant's offers of proof would not entitle him to relief. The tendered affidavit would have in no way exonerated the movant from his involvement in the crimes.").

Arguing that Trotter is not entitled to relief, the State, urging us to apply a standard of review applicable to a motion for new trial, suggests the district court assessed credibility. The State argues we should not substitute our judgment for that of the judge who presided over the trial. However, the State implies a credibility determination that was not explicitly stated by the district court. Without specific findings regarding credibility, deference to the district court's credibility determination cannot serve as the basis for our decision.

In addition, the State argues that the affidavits are factually insufficient to show relief is warranted. In this regard, we agree with the State.

Regarding Nash's affidavit, even if we were to read it broadly as being a recantation of his trial testimony and not just a recantation of his testimony at his preliminary hearing as stated in the opening sentences of the affidavit, the affidavit is consistent with Nash's trial testimony and the testimony of his codefendants. All of them agreed that Nash was not at the scene during the home invasion and the homicides. His testimony and that of all of his codefendants

substantiates that he did not observe what took place or the roles of anyone in the actual commission of the robbery or murders.

Regarding Eddington's affidavit, as the district court noted, Eddington makes a broad statement, referring to "the statement I made . . . against . . . Christopher Trotter." We agree with the district court that this broad statement is insufficient because it lacks the specificity necessary for the court to judge whether the changed testimony is material. See *Sullivan*, 222 Kan. at 223. Nevertheless, our analysis cannot end here because, although not discussed by the district court, Eddington becomes more specific, indicating that "the police made it clear that Chris Trotter had to be the the [*sic*] master mind behind this whole crime! So I made my statements and testmonies [*sic*] match up to what they wanted to hear!" Importantly, Eddington does not suggest that Trotter was not a participant in the crimes; he merely suggests Trotter was not the mastermind.

This statement is contrary to Eddington's testimony at trial and is contrary to the testimony of Navarre and Nash. Each of the codefendants indicated the robbery had been Trotter's idea and he had approached them to see if they would participate. In addition, during questioning, each of the codefendants was led through the planning process and asked about Trotter's ideas and actions in preparing for the robbery.

Nevertheless, it is not relevant to Trotter's guilt or innocence whether he was the mastermind, a mere follower, or something in between. His role as the instigator or mastermind did not relate to any element the State was required to prove. Arguably, such evidence might have been relevant to premeditation if there had been a suggestion that the murders had been a part of the plan. But there was no evidence from Eddington or anyone else that murder had been contemplated or discussed. Rather, the evidence was of a plan to merely restrain the victims, a plan that went tragically awry when Wallace fought with Trotter and removed the shirt Trotter was wearing over his face to hide his identity. Regarding the robbery charge, the court instructed the jury on an aiding and abetting theory. Under this theory, it was necessary to show that Trotter had aided the robbery, but it was not necessary to establish

that he was the mastermind. Likewise, to support the conspiracy charge, the State had to prove Trotter was a conspirator but did not have to establish he was the instigator or leader of the conspiracy.

On the other hand, a defendant's role as a mastermind could be material in determining whether the death penalty should be imposed. Hence, had the jury decided to impose the death penalty in this case our conclusion might be different. But that punishment was not imposed, and Trotter's role as a mastermind is irrelevant to Trotter's guilt or innocence. Thus, based upon our de novo review, we conclude the affidavit is insufficient to establish the right to an evidentiary hearing; the altered testimony would not be material or exonerate Trotter.

The district court correctly rejected Trotter's contentions and correctly decided to summarily deny the K.S.A. 60-1507 motion.

Affirmed in part and reversed in part.