NOT DESIGNATED FOR PUBLICATION

No. 127,293

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DONQUEZ L. JONES,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; TYLER ROUSH, judge. Oral argument held July 8, 2025. Opinion filed September 26, 2025. Affirmed in part, vacated in part, and remanded with directions.

*Peter Maharry*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before CLINE, P.J., MALONE and PICKERING, JJ.

CLINE, J.: Donquez L. Jones appeals his convictions, sentence, and a pretrial motion to dismiss the case based on violation of his speedy trial rights. He claims his convictions should be vacated because almost six years passed between when he was charged and tried. Alternatively, he argues, they should be reversed because the prosecutor misstated the law in closing, and the district court erred when instructing the jury and when responding to a juror question. He also claims the fees imposed as part of his sentence were miscalculated.

1

After reviewing the record, we agree the district court miscalculated the fees. K.S.A. 28-176(a) provides for assessment of a $400 fee per individual offense. Because Jones' four convictions merged, he stands convicted of two offenses and not the four the court used when calculating the fees. But we do not find the court improperly instructed the jury or incorrectly answered the jury's question. Nor do we find that Jones' speedy trial rights were violated. And even assuming the prosecutor misspoke in closing, we find that error did not impact Jones' convictions.

We therefore affirm Jones' convictions but vacate the portion of his sentence imposing fees and remand with instructions to impose fees of $800 to each of the entities.

FACTUAL AND PROCEDURAL BACKGROUND

In 2015, 15-year-old A.K., while living at her grandmother's house, received a Facebook friend request from a user with the profile name Rebel Spirit (who was later identified as Jones). A.K. did not know the user but accepted his friend request and began communicating with him through Facebook Messenger and, eventually, by text. Within a week or two, the messages became sexual in nature. Jones sent A.K. pictures of his penis and, at his request, A.K. sent naked pictures of herself. The two also discussed having sex with each other.

As the sexual messages and pictures continued, A.K. and Jones eventually made plans to meet near where she lived at around 5:30 a.m., before A.K. went to school. The messages between the two implied that they intended to have sex when they met up. But as the date of the scheduled meeting approached, A.K. expressed some hesitation. She wrote in one message: "[I] don't wanna fuck tho. Because I'm not ready." When Jones expressed surprise and said he wished A.K. had told him sooner, A.K. replied: "[I] just don't want to i just want to hang with u Bu[]t u never know i might wasn't [*sic*] to fuck we will just see."

On March 30, 2015, the morning of the planned meeting, A.K. left home around 5:30 a.m. and walked to the bus stop, which was right behind her home. A.K. was sitting at the bus stop when she saw Jones (whom she knew as Rebel Spirit) walking toward her. After they met, Jones pulled A.K. by the wrist and led her to the neighbor's yard that bordered her grandmother's backyard. On the ground behind a small shed, Jones began having vaginal intercourse with A.K. At first, A.K. "was okay" with the sexual encounter, but it got "more intense," and A.K. was no longer okay when he "start[ed] to do it really hard" and the encounter became physically painful. Although A.K. never told him to stop during the vaginal sex, she did try to use her legs to pull herself away from him once it began hurting. In response to A.K.'s use of force, A.K. said Jones pinned her down and continued having vaginal sex.

Jones then flipped A.K. over so that she was on her knees. As he inserted his penis in her anus, A.K. said she stated, "'No, no, no. Stop.'" Despite her plea, he replied, "'No, I don't give a fuck, I'm going to keep going.'" Jones continued having anal sex with A.K. for about five minutes as she cried, repeatedly told him to stop, and tried to push him away. But he was stronger than her and did not stop until he began to ejaculate. He began ejaculating in A.K.'s anus, but then grabbed A.K.'s face, "shove[d]" her face into his penis, and finished ejaculating into her mouth. When interviewed about this encounter, A.K. reported that after Jones had anal sex with her, he went back to vaginally raping her and she responded, "No. Stop. Don't do that." To which he replied that he did not care because he was about to ejaculate.

Once the sexual encounter was over, A.K. saw the bus arriving, got on it, and went to school. During the school day, A.K. and Jones exchanged messages where she conveyed that she had fun during the encounter and told him that she loved him. When the school day was over, A.K. was picked up by her uncle who also lived with A.K. and her grandmother. A.K.'s grandmother and uncle saw a man walking on the street outside the home early that morning, around the time that A.K. would have been waiting for the

3

bus. Upon picking A.K. up from school, her uncle asked her about the man, and A.K. admitted she had met up with a man she had met on the internet. A.K.'s uncle asked her if she had sex with the man, and A.K. replied that he had raped her. The uncle told A.K.'s grandmother, and then A.K. told her grandmother what happened.

The grandmother took A.K. to the hospital, where she underwent a full physical examination and had her clothing collected. Officer David Stull spoke with A.K. at the hospital, where she recounted what happened. About two months later, A.K. was interviewed by Detective Nathan Gerdsen of the Exploited and Missing Children's Unit. In the recorded interview, A.K. again stated that the sexual encounter began as voluntary but said she told Jones to stop after it became painful. She reiterated that she told him to stop throughout the anal sex, as well as during the second episode of vaginal penetration.

Law enforcement then sought to identify the man A.K. knew as Rebel Spirit. DNA testing was conducted on swabs taken from A.K. and her clothing, and in 2016, the results identified Jones as the suspect. After learning Jones' identity, officers sought to locate him by running a utilities check, checking law enforcement databases, and checking his last-known address information. Although the State failed to locate Jones, he was charged and a warrant issued to ensure that police would know if Jones had contact with law enforcement agencies in other jurisdictions.

The State then filed its initial complaint in August 2016, charging Jones with criminal sodomy. Police did not locate and arrest Jones until July 2022. In December 2022, an amended warrant was filed, charging Jones with two sets of alternative counts: criminal sodomy (count 1) and aggravated criminal sodomy (count 2); and aggravated indecent liberties with a child (count 3) and rape (count 4).

After his arrest, Jones moved to dismiss the case, alleging his right to a speedy trial was violated because of the timespan between the filing of charges, his arrest, and

subsequent trial. The State countered that it was difficult to locate Jones and that without filing the charges, it would not have been able to have an active warrant for Jones' arrest. The district court denied Jones' motion after a hearing, noting the State's delay in prosecuting Jones was not intentional and, in fact, it expended significant efforts to locate Jones.

The case proceeded to trial and the jury convicted Jones of all four counts. The court sentenced Jones to 653 months in prison for rape, and a consecutive, 165-month term for aggravated criminal sodomy. The court did not sentence Jones on counts 1 and 3, noting that those counts merged with the alternative counts.

REVIEW OF JONES' APPELLATE CHALLENGES

I. *Did the district court err by not dismissing Jones' case for violation of his speedy trial right?*

Jones argues his constitutional right to a speedy trial was violated since, although charges were filed against him in August 2016, the case did not go to trial until July 31, 2023. He unsuccessfully moved to dismiss the case on this basis before trial, so he has preserved this issue for appeal.

When considering a district court's decision on a defendant's constitutional speedy trial right, appellate courts review the supporting factual findings for substantial competent evidence. But appellate courts review the ultimate legal conclusion drawn from those facts de novo. *State v. Owens*, 310 Kan. 865, 868, 451 P.3d 467 (2019); see also *In re Care & Treatment of Ellison*, 305 Kan. 519, 533, 385 P.3d 15 (2016) ("Whether a lower court properly applied the *Barker*[ *v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972)] factors is a question of law subject to unlimited review."); *Barker*, 407 U.S. 514.

The Sixth Amendment to the United States Constitution grants every defendant the "right to a speedy and public trial." Similarly, section 10 of the Kansas Constitution Bill of Rights guarantees Kansas defendants "'[i]n all criminal prosecutions . . . a speedy and public trial, by an impartial jury.'" *State v. Owens*, 310 Kan. 865, 869, 451 P.3d 467 (2019). "'The constitutional protection of a speedy trial attaches when one becomes accused and the criminal prosecution begins, usually by either an indictment, an information, or an arrest, whichever first occurs.'" *State v. Rivera*, 277 Kan. 109, 112, 83 P.3d 169 (2004).

A speedy trial assessment looks at the totality of the circumstances in a case, with special emphasis on four factors: (1) length of delay, (2) reason for the delay, (3) defendant's assertion of his or her right, and (4) prejudice to the defendant. See *Barker*, 407 U.S. at 530; *In re Care & Treatment of Ellison*, 305 Kan. at 531. These factors— known as the *Barker* factors—are nonexclusive. 407 U.S. at 530. While none of the factors, standing alone, is sufficient for finding a violation, "'[t]he length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.'" *Rivera*, 277 Kan. at 113.

A. *Length of delay*

Jones was charged on August 22, 2016, and arrested on July 13, 2022, with his initial appearance in court on the next day. So, the time between when the State charged Jones and his arrest/first appearance is about one month shy of six years.

Jones contends this delay is presumptively prejudicial. He primarily relies on *State v. McDonald*, 62 Kan. App. 2d 59, 506 P.3d 930 (2022), to support his position. In *McDonald*, the defendant was charged with rape of a child under 14 years old. 62 Kan. App. 2d at 62. There was a six-year period between when the State charged McDonald

and his arrest and first appearance. This court found that six-year delay presumptively prejudicial. It reached this conclusion after reviewing other cases where presumptive prejudice was established. 62 Kan. App. 2d at 65; see also *Rivera*, 277 Kan. at 114 (244 days from time warrant served to preliminary hearing found presumptively prejudicial); *State v. Ruff*, 266 Kan. 27, 32, 967 P.2d 742 (1998) (three years presumptively prejudicial); *State v. Fitch*, 249 Kan. 562, 563-64, 819 P.2d 1225 (1991) (402 days presumptively prejudicial). The *McDonald* court also noted that under *Barker*, "a delay that might be tolerable for a 'serious, complex conspiracy charge' would be entirely unacceptable for 'an ordinary street crime.'" *McDonald*, 62 Kan. App. 2d at 65 (quoting *Barker*, 407 U.S. at 531). It found McDonald's charge of rape was "serious," but "not complex enough to warrant a delay of over six years." *McDonald*, 61 Kan. App. 2d at 65.

As the district court here recognized, Jones' and McDonald's circumstances are similar. Both had an approximate six-year delay between being charged for a child-related sex abuse crime and being arrested. According to the court, there was "no distinction" between the two cases. We agree, so we move on to analyze the other *Barker* factors.

### B. *Reason for the delay*

"The flag all litigants seek to capture is the second factor, the reason for delay." *United States v. Loud Hawk*, 474 U.S. 302, 315, 106 S. Ct. 648, 88 L. Ed. 2d 640 (1986). In evaluating this factor, courts look at who was more to blame for the delay—the government or the defendant. *Doggett v. United States*, 505 U.S. 647, 651, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992). And when assessing responsibility, intentional actions, such as "a deliberate attempt by the State to thwart the defense," weigh heavily against the State and "a more neutral reason, like negligence or a crowded court docket," weighs less heavily against the State. *Rivera*, 277 Kan. at 114.

7

Jones believes this factor favors him because he thinks his case mirrors *McDonald*. In *McDonald*, the defendant was charged in May 2013, but he was not arrested until July 2019 in Utah. From 2016 to 2019, McDonald worked for a roofing company in Wyoming and Utah and obtained his job using his legal name and Social Security number. 62 Kan. App. 2d at 62-63. The district court granted McDonald's motion to dismiss on constitutional speedy trial grounds because it found the State had acted negligently in trying to locate McDonald. On appeal, this court agreed, highlighting how the State conducted only six inquiries in six years to try to locate McDonald, and "that after 2013, McDonald kept a phone number and post office box, worked openly under his legal name, and used his social security number in New Mexico and other states." 62 Kan. App. 2d at 67.

But the State's significant efforts here are vastly different from those in *McDonald*. For instance, shortly after the case was charged, Jones' warrant was put into the National Crime Information Center database. Deputy Edward Clark also ran a utilities check, a driver's license check, and contacted Westar Energy to check Jones' last reported address. Westar said the address, on Bluffview, had been listed under a different tenant since 2012. Clark checked whether Jones had any vehicles listed in his name but found none. He also found no employment information for Jones and discovered Jones' public Facebook profile page had no activity since 2015.

Deputy Clark went to the address listed on Jones' driver's license, an apartment complex on Edgemoor, and the leasing agent told Clark another couple lived there. The agent could not positively state that they saw Jones there. Even still, Clark conducted surveillance for a day or two and never saw anyone at the residence, and no one answered when he knocked on the door. Clark explained that in Sedgwick County, they had around 10,000 active warrants and only five warrant deputies, so he periodically checked the address when he was in the area.

8

Because police could not locate Jones using other methods, in mid-September 2016, Jones was named the Felon of the Day. As part of that program, a poster with Jones' picture and information was distributed to local media and law enforcement agencies. Police received no tips regarding Jones' whereabouts.

In the months and years that followed, Deputy Clark continued to periodically check all available databases to determine whether there was any updated information regarding Jones' driver's license status, employment, utilities, or vehicle registration. None of the database searches yielded any new information regarding Jones' whereabouts.

In October 2019, Clark changed the warrant from confidential to active in the computer system. This change meant that the warrant was posted on the sheriff's website and would be visible to anyone who checked the website to see if he had an outstanding warrant.

On January 22, 2020, Jones called the sheriff's office and asked whether he had an active warrant. The administrative specialist who handled the phone call told Jones that he did and said he could turn himself in or go to the walk-in docket. She also sent Clark the phone number Jones used when he called. Clark called the number and confirmed the person who answered was, in fact, Jones. Clark reiterated that Jones could turn himself in to police or go to the walk-in docket, and Clark offered to pick Jones up if he needed a ride. Jones declined the offer, claiming he would contact an attorney and "come in." Clark conducted a reverse lookup on the phone number that Jones was using, but it did not yield any useful information regarding an address. Jones did not say where he was at the time of the call, but he provided the Bluffview address when asked for his personal information. Clark checked that location, but the vehicle outside the residence was registered in someone else's name.

In February 2020, Deputy Clark placed Jones on the Top Ten Most Wanted page of the sheriff's website. That information is disseminated nationally to federal law enforcement agencies. The following month, Clark entered Jones' name into a new database the sheriff's office had recently gained access to, but the database had no useful information about Jones. During the spring and summer of 2020, Clark checked the various databases monthly. And he continued to check Jones' Facebook account even though there was no new activity. During this period, due to the COVID-19 pandemic, law enforcement officers were advised to only go out and try to physically locate people with outstanding warrants if they had a specific address to check.

On July 11, 2022, law enforcement received a tip through Crime Stoppers that Jones "was back in town and living at the . . . Edgemoor address." The nature of the tip led Clark to believe that one of Jones' family members lived at the Edgemoor apartment. This was the "first solid address" police had for Jones since 2011. Clark surveilled the residence for two days, and on July 13, he saw Jones step outside to check the mail. After calling for additional units Clark knocked on the door. Jones' brother answered, and Jones was taken into custody.

Despite these myriad efforts, Jones nevertheless claims the State's efforts were "lackluster" and blames police for not contacting "individuals involved in [his past crimes]" to see if there was a possibility they knew of Jones' whereabouts. According to Jones' presentence investigation report, his previous crimes included criminal trespass, arson, burglary, disorderly conduct, harassment by phone, attempted robbery, and criminal threat. Jones does not specify on appeal who he claims the police should have contacted—that is, whether it be witnesses, victims, or possible codefendants. But at trial he asked Clark whether he contacted any witnesses identified in the police reports for his past crimes (Clark did not). And later in his brief on appeal, he chides the police for not contacting Jones' "known associates" or family members.

10

Yet Jones' argument that the State did the "bare minimum" is unsupported by the record. And, while Jones claims the district court "blamed [Jones] for disappearing," and found Jones was "hiding out," the court never made these statements, nor do Jones' record citations for these statements support his contention. Although the court noted Jones "disappeared off the radar," and it was hard for police to locate him, it did not find Jones purposefully evaded police by hiding to avoid arrest. Jones also fails to explain why witnesses to Jones' crimes would know of Jones' current location or how police were to identify or contact his "known associates" or family members.

Based on this record, we find the second *Barker* factor—the reason for delay—heavily weighs in favor of the State.

## C. *Assertion of the right*

Both Jones and the State agree that Jones moved to dismiss the case on speedy trial grounds in July 2023, one year after his arrest. But the State nevertheless contends that this factor weighs against Jones because, at the very least, Jones had notice of his warrant in January 2020 when he called the police inquiring about the arrest. In *Doggett*, the Court noted that if a defendant knows of his indictment years before he was arrested, "*Barker*'s third factor, concerning invocation of the right to a speedy trial, would be weighed heavily against him." 505 U.S. at 653.

Since the same is true here, we find this factor weighs heavily against Jones as well.

## D. *Prejudice*

The final *Barker* factor considers "whether the defendant suffered prejudice as a result of the delay." *United States v. Walker*, 92 F.3d 714, 719 (8th Cir. 1996). "A

11

showing of actual prejudice is required if the government exercised reasonable diligence in pursuing the defendant. Where the government has been negligent, however, prejudice can be presumed if there has been an excessive delay. [Citations omitted.]" *United States v. Erenas-Luna*, 560 F.3d 772, 778-79 (8th Cir. 2009). Importantly, the presumption of prejudice for the fourth *Barker* factor "differs from the initial presumption necessary to trigger consideration of the *Barker* factors." *McDonald*, 62 Kan. App. 2d at 73.

As established in analyzing the second *Barker* factor, the State exercised reasonable diligence in pursuing Jones. It is therefore Jones' burden to show actual prejudice. We review actual prejudice "'in the light of the interests of defendants which the speedy trial right was designed to protect . . . . (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.'" *United States v. Aldaco*, 477 F.3d 1008, 1019 (8th Cir. 2007); see *McDonald*, 62 Kan. App. 2d at 70. Of these interests, prejudice is "'the most serious . . . because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.'" *Walker*, 92 F.3d at 719 (quoting *Barker*, 407 U.S. at 532).

The only interest Jones claims was prejudiced by the delay in prosecuting him is his ability to defend himself. He offers a few contentions to support this conclusion: (1) Jones accused A.K. of not remembering the case at trial; (2) A.K.'s uncle passed in 2018; (3) memories fade with time; and (4) there is a difference between A.K. testifying near the age the crime occurred at 15 years old versus the time of the actual trial when she was 23 years old.

First, Jones does not explain how A.K.'s failure to remember facts of the case prejudiced his defense. In Jones' motion to dismiss, he stated "during her testimony at the preliminary hearing, the alleged victim was clear that there were parts of the case she simply could not remember." Yet on appeal Jones fails to cite any place in the record

where A.K. stated this. Further, he misconstrues the record to create the only example he alleges of how this memory lapse allegedly prejudiced him. Jones points out that A.K. testified at trial that she thought she told "a teacher and a counselor" about what happened between her and Jones and then did not identify them at trial, intimating A.K.'s memory lapse is the reason. But Jones never asked A.K. to identify the teacher and counselor at trial, and she never testified she did not remember their identities. Instead, after A.K. said she told some friends at school about what happened, Jones asked A.K. if she told any teachers. A.K. responded that she thought she told a teacher and a counselor. Jones then ignored this answer, switched gears, and asked A.K. why her uncle picked her up after school. If Jones was concerned about the identity of those individuals, he should have asked a follow-up question on cross-examination asking A.K. to identify them. Any prejudice he now claims from not learning their identity appears to be his fault, not A.K.'s alleged memory lapse.

Jones also makes only a conclusory statement about how A.K.'s uncle's passing in 2018 prejudiced him, simply saying he was unable to question the uncle about what A.K. claimed happened when he picked her up from school. But even though Jones could not question A.K.'s uncle, A.K.'s grandmother testified that A.K.'s uncle told her what happened when he picked A.K. up from school. She also testified that one of the officers spoke to A.K.'s uncle. Yet Jones did not ask A.K.'s grandmother what A.K.'s uncle told her. Nor did he ask the officer what A.K.'s uncle told him. So, again, while A.K.'s uncle was not available for questioning, two other witnesses were—with whom he spoke shortly after the incident—who Jones could have questioned about what A.K. told her uncle. We find his failure to pursue these opportunities mitigates any prejudice Jones now claims arose from A.K.'s uncle's passing.

Next, Jones makes a conclusory statement that memories fade and decay over time. While this is true, he provides no examples of how this truism impacted his case. Mere conclusory allegations are insufficient to establish actual prejudice. *United States v.*

13

*Hayes*, 40 F.3d 362, 366 (11th Cir. 1994). And as the State points out, since all the witnesses were called by the State, if any of them were unable to remember certain details, then the State's case-in-chief would be prejudiced instead of Jones'. *McDonald*, 62 Kan. App. 2d at 72 (quoting *Barker*, 407 U.S. at 521) ("A lengthy delay may be more likely to weaken the prosecution's case than the defense's because 'it is the prosecution which carries the burden of proof.'").

Jones also fails to explain how his cross-examination of the State's witnesses, like A.K., was impacted. He fails to articulate any missing details in witness testimony or his inability to explore lines of questioning, nor does he cite any examination in the record to support his conclusion. Without any argument or suggested evidence by Jones that demonstrates that witnesses suffered memory lapses, Jones fails to prove actual prejudice on this basis.

Last, Jones points out that memories change because of life experiences. See *Green v. Loggins*, 461 F. Supp. 24, 36 n.15 (N.D. Cal. 1978) ("The mind combines all the information acquired about a particular event into a single storage 'bin,' making it difficult to distinguish what the witness saw originally from what she learned later."). He asserts that he was prejudiced because A.K. "as a testifying 23 year-old will surely be different from her perceptions she had as a 15 year-old." While this concept theoretically makes sense, Jones fails to show how it applied to his case. He provides no examples of how he believes A.K. testified differently at 23 years old than she would have at 15 years old, and the video of A.K.'s interview was played at trial, thus giving the jury an opportunity to hear the account she gave to police mere weeks after the incident. Further, the messages and pictures that Jones and A.K. exchanged in the days leading up to the incident were also introduced. In other words, inculpatory evidence unaffected by the passage of time was introduced for the jury's consideration, which would also mitigate any claimed prejudice on this basis.

14

Since Jones is unable to demonstrate actual prejudice, and we need not examine presumptive prejudice because we did not find the State's delay was unreasonable given its efforts, his speedy trial claim fails. We therefore affirm the district court's decision to deny Jones' motion to dismiss the case on speedy trial grounds.

II. *Did the district court err in how it responded to the jury's question about age and consent?*

Jones argues the district court incorrectly answered a question from the jury, which warrants a reversal of his convictions and a new trial. We review a district court's response to a jury question under a two-step analysis:

> "First, we conduct a de novo review to determine if the district judge either failed to respond or provided an erroneous response to the jury's question. Second, if the district judge responded to the jury's request, we review the sufficiency or propriety of the response for abuse of discretion. *State v. Boyd*, 257 Kan. 82, Syl. ¶ 2, 891 P.2d 358 (1995). A district judge's response constitutes an abuse of discretion when no reasonable person would have given the response, the response includes an error of law, or the response includes a factual error. *State v. Wade*, 295 Kan. 916, 920, 287 P.3d 237 (2012) (quoting *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 [2011])." *State v. Walker*, 308 Kan. 409, 423, 421 P.3d 700 (2018).

During deliberations, the jury asked: "Under Kansas law, if a minor (under the age of 16) gives consent to having sexual intercourse, is it still considered consent under the law?" To understand the age and consent question and the district court's ultimate response, a review of the counts against Jones and their respective jury instructions is informative. The elements of counts 1 (criminal sodomy) and 3 (aggravated indecent liberties) were covered by Jury Instruction numbers 3 and 5, respectively. Those two counts required proof that the defendant engaged in the prohibited sex act, and that the victim was 14 or 15 years old. The State was not required to prove that the victim did not consent. See K.S.A. 2014 Supp. 21-5504(a)(3) and K.S.A. 2014 Supp. 21-5506(b)(1).

15

The elements of counts 2 (aggravated criminal sodomy) and 4 (rape) were covered by Jury Instruction numbers 4 and 6. Both of those counts required proof that the victim did not consent to the sex acts. Unlike counts 1 and 3, the victim's age was not an element of counts 2 and 4. See K.S.A. 2014 Supp. 21-5504(b)(3)(A) and K.S.A. 2014 Supp. 21-5503(a)(1)(A).

After the district court received this question, both parties convened to discuss the appropriate response. In discussing the matter, the court noted that consent was only an element in two of the counts (counts 2 and 4), which were covered in instructions 4 and 6. The court planned to respond by informing the jurors that age "is irrelevant" to the determination of consent in those two counts. The prosecutor suggested that it would be more appropriate to reply that "age is not an element of consent in Instructions 4 and 6."

Jones objected and asked for the district court to refer the jury back to the instructions. He believed the jury instructions "already say[] the things that are accomplished by what you proposed," but he simultaneously thought the proposed answer "suggest[s] something that they should go do and turns them to a place that they should go." He emphasized that highlighting the instructions would be the most "neutral" action. The court denied Jones' request because it thought the jury's question "deserves an answer that actually answers the question. The answer that [the prosecutor] proposed is an accurate statement of the law and directly answers the question that [the jurors] have requested." Thus, the court responded to the jury with the prosecutor's suggested answer.

Jones is mainly concerned with the district court's response because he claims it "would have sown confusion with the jury." He believes the court's answer incorrectly implies "that there [are] elements of consent." In essence, because the court's answer stated "[a]ge is not an *element* of consent," Jones posits the jury would implicitly conclude there are elements of consent. (Emphasis added.) And he believes the court's answer, combined with statements made by the State in voir dire and closing to the effect

16

that children under the age of 15 cannot consent to have sex under the law, means the jury would not believe Jones' defense, that A.K. consented, was a legally viable defense. He claims the court's answer "pushed the jury to convict [Jones] of rape and aggravated criminal sodomy based on her age and legal inability to consent rather than on whether she actually consented to the sexual encounter." Jones says the court should have answered yes to the jury's question or simply referred the jury back to the instructions.

Jones' argument is unavailing. First, Jones fails to consider the context of the jury's question and the cause of its confusion. Jury Instruction 3, count 1 (criminal sodomy) and Jury Instruction 5, count 3 (aggravated indecent liberties) do not mention the term consent, because consent is irrelevant to these charges. Age, however, is pertinent to these two counts. And, on the flip side, Jury Instruction number 4, count 2 (aggravated criminal sodomy) and Jury Instruction number 6, count 4 (rape) both mention consent but not age. These inconsistencies could be difficult for a jury to grasp, which could be why the jury wanted clarification on whether the concept of age and consent overlap between all four counts. If the district court had referred the jury back to the instructions or simply answered yes, that would not have clarified the issue.

Yet the answer the district court provided was legally correct and gave a more precise response than Jones' suggested answers. As the State points out, the jury's question concerned whether age factors into the question of consent. The logical conclusion, therefore, is that the jury's question did not concern Jury Instruction number 3 or 5 because those instructions do not concern consent but, instead, the question sought to clarify Jury Instruction number 4, count 2 (aggravated criminal sodomy) and Jury Instruction number 6, count 4 (rape), because those instructions *do* include the term consent but *do not* include any reference to age. Presumably, the jury wanted clarity about whether it had to consider age when determining whether the State proved A.K. did not consent when deciding those charges. The district court answered the jury's question by explaining that the victim's age had no bearing on whether she was capable of

17

consenting for purposes of counts 2 and 4. Since, under K.S.A. 2014 Supp. 21-5504(b)(3)(A) and K.S.A. 2014 Supp. 21-5503(a)(1)(A), age is irrelevant to whether A.K. consented to these acts, the answer to the jury's question is legally appropriate. And since the court specified which jury instructions its answer related to, it clarified to the jury the differences between counts 1 and 3—for which age but not consent is an element—and counts 2 and 4—for which consent but not age is an element.

We also do not find the court's use of the term "element" in its answer to be confusing. Each crime has certain elements the State must prove, which is a commonly understood concept. Those elements—or claims, as they were labeled here—were set out in the jury instructions. For example, to prove the crime of rape, Jury Instruction number 4 told the jury the State had to prove: (1) Jones knowingly engaged in sexual intercourse with A.K., (2) A.K. did not consent to the sexual intercourse, (3) The sexual intercourse occurred under circumstances when A.K. was overcome by force or fear, and (4) This act occurred on or about the 30th day of March, 2015, in Sedgwick County, Kansas. So the jury knew the State had to prove A.K. did not consent in order to find Jones guilty. And the court's answer clarified that A.K.'s age was not a factor in its deliberation of that element or claim that must be proven by the State. The court did not tell the jury—as Jones intimates—that the State need not prove consent; it told the jury that it need not consider A.K.'s age when determining whether she consented. Instead of "pushing" the jury to convict Jones of rape and aggravated criminal sodomy based on her age and legal inability to consent, the court prevented the jury from improperly doing so by telling it her age was not a factor or an element in whether she consented to the acts in those charges.

Had the district court answered the jury's question as Jones wished, with a simple "yes," that response would have been inaccurate. As discussed above, it was necessary for the district court to qualify its response with a reference to two jury instructions because the two other jury instructions for the other two counts contain distinct elements.

18

As the State puts it, such a response is wrong because "even if the jury had concluded that the victim 'consented' to the sexual activity, [Jones] still would have been guilty of sodomy and aggravated indecent liberties simply by virtue of [A.K.'s] age."

The district court did not abuse its discretion in responding to the jury's question. It was appropriately grounded in the law and facts of this case, and a reasonable juror would be able to understand that the court's response meant A.K.'s age is not a factor in evaluating the rape and aggravated criminal sodomy charges. Jones has failed to persuade us to reverse his convictions on this basis.

III. *Did the State prejudice Jones' trial by committing prosecutorial error when it stated an individual cannot consent if that individual is under 16 years old?*

Jones next argues the State committed prosecutorial error based on statements it made during voir dire and closing arguments. The State contends the prosecutor did not err because it contends that Jones takes the prosecutor's statements out of context.

An appellate court uses a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sieg*, 315 Kan. 526, 535, 509 P.3d 535 (2022). First, "the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). Second, "[i]f error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial." 305 Kan. at 109. Put differently, "prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" 305 Kan. at 109.

19

Jones highlights several remarks made by the State during voir dire and closing arguments that he believes were improper and further compounded the highly contested discussion at trial concerning consent. During voir dire, the State asked:

"Anybody have a problem that if you have sex with somebody under the age of 16 you have the potential of being charged in criminal court because of that? Anybody have a problem that as a community we decided that's your cutoff, 16 and above you can consent, 15 and below a child at that age cannot give consent to have sex. Anybody have a problem with that, that we've done that? We've put that line in the sand?"

Later during voir dire, the State also stated, "Any issues that our—our laws say that the age of consent of 16 for a child. Do you have any issues with that age? Do you wish it I [*sic*] was higher or lower?" And later again, it told the jury it may have to discuss consent, "[W]as someone consenting or not, okay. So children 15 and younger, the law says you can't give consent. Okay. But there are also some charges that are going to be presented where consent is an issue, whether she did consent or not." In closing, the State stated, "[T]he law says a 15-year-old cannot give consent."

Jones posits that these comments are inaccurate statements of law as applied to the charge of rape and aggravated criminal sodomy. He believes that since neither aggravated criminal sodomy nor rape qualify consent with age, the State misstated the law during trial. And this misstatement, according to him, is amplified by consent being a key issue at trial. On appeal, Jones notes his theory at trial was that there was "considerable evidence that the encounter between [A.K.] and [Jones] was consensual" because in their messages leading up to the date indicated she was mostly a willing participant, after the encounter A.K. stated she had fun and loved Jones, and she only reported the rape when confronted by her uncle.

That said, even if we assume the prosecutor's statements were made in error, those statements are not prejudicial to Jones. Most importantly, the prosecutor told the jury that

20

to find Jones guilty on counts 2 and 4, it had to find A.K. did not consent to the sex acts. She stated in closing arguments, "So here's the issue, I—on the other two counts. Those are different. It's the same sex act, but what has to be proven in addition or different than what's 1 and 3 is that she didn't consent and she was overcome by force or fear. Okay?"

When describing the facts the prosecutor believed supported a conviction on these counts, she repeatedly pointed to evidence that the victim withdrew her consent to the sex acts. And in rebuttal, right before the jury was dismissed for deliberations, the prosecutor argued:

> "So then it got rough, and she withdrew her consent, and he continued for his own sexual gratification because he was going to come. And he didn't stop until he got what he wanted. That's rape. That's agg[ravated] crim[inal] sodomy. He committed those crimes based on the evidence that you heard. And then on [counts] 1 and 3, just for having sex with her and having anal sex with her because she was 15, he's violated our laws. Follow the law, find this man guilty."

The prosecutor made clear to the jury that to find Jones guilty of rape and aggravated criminal sodomy, it must find A.K. withdrew her consent from the sex acts. And to find Jones guilty on counts 1 and 3, age is an applicable element. While the prosecutor should have been more careful with her words, she never expressly stated Jones could be found guilty of rape and aggravated criminal sodomy without proof that A.K. did not consent. And the jury was instructed that lack of consent was an element of these two offenses. Given the prosecutor's curative statements, and the fact that we presume jurors follow the instructions they receive, we find the prosecutor's statements did not prejudice Jones' trial. See *State v. Mattox*, 305 Kan. 1015, Syl. ¶ 2, 390 P.3d 514 (2017) ("Jurors are presumed to follow the instructions they receive in the district court.").

21

IV. *Did the district court err in failing to instruct the jury on a modified* Bunyard *instruction?*

Jones next argues that the district court erred in failing to give a modified *Bunyard* jury instruction. See *State v. Bunyard*, 281 Kan. 392, 133 P.3d 14 (2006), *disapproved of by State v. Flynn*, 299 Kan. 1052, 329 P.3d 429 (2014). When an individual withdraws consent from a sex act, Jones contends a modified *Bunyard* instruction should be given.

When analyzing jury instruction issues, appellate courts follow a three-step process: (1) determining whether the appellate court can or should review the issue, in other words, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, in other words, whether the error can be deemed harmless. *State v. Holley*, 313 Kan. 249, 253, 485 P.3d 614 (2021). See K.S.A. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous.").

At the second step, appellate courts consider whether the instruction was legally and factually appropriate, using an unlimited standard of review of the entire record. *Holley*, 313 Kan. at 254. In determining whether an instruction was factually appropriate, courts must determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction. 313 Kan. at 255.

Whether a party has preserved a jury instruction issue affects the appellate court's reversibility inquiry at the third step. 313 Kan. at 254. When a party fails to object to a jury instruction before the district court, an appellate court reviews the instruction to

determine whether it was clearly erroneous. K.S.A. 22-3414(3). For a jury instruction to be clearly erroneous, the instruction must be legally or factually inappropriate and the court must be firmly convinced the jury would have reached a different verdict if the erroneous instruction had not been given. The party claiming clear error has the burden to show both error and prejudice. *State v. Crosby*, 312 Kan. 630, 639, 479 P.3d 167 (2021).

Jones recognizes that he did not object to the pertinent instruction below. He therefore acknowledges he must prove clear error.

Jones argues a modified *Bunyard* instruction is legally and factually appropriate under his circumstances.

> "A *Bunyard* instruction informs a jury that under Kansas law, rape occurs when the victim has initially consented to sexual intercourse with the perpetrator and then clearly withdraws that consent during the act, so long as the perpetrator then fails to stop within a reasonable time. What amounts to a reasonable time must be measured against the facts of a given case and presents an issue for the jury's determination." *State v. Franco*, 49 Kan. App. 2d 924, Syl. ¶ 3, 319 P.3d 551 (2014).

The court noted in *Franco* that this instruction, if appropriate, should be given in a prosecution for aggravated criminal sodomy as well. *Franco*, 49 Kan. App. 2d 924, Syl. ¶ 3. But *Bunyard*'s holding was partially disapproved in *Flynn*. In *Flynn*, the Supreme Court reversed Flynn's rape conviction because it found the trial court committed clear error by not instructing the jury about the law of withdrawn consent. 299 Kan. at 1069. And the court specifically disapproved the "'reasonable time'" language from *Bunyard*, finding such language "contrary to the plain language of the rape statute." *Flynn*, 299 Kan. at 1066-67.

23

The *Flynn* court, however, reaffirmed the conclusion from *Bunyard* that the jury must be told that consent for intercourse may be given and then withdrawn but must be communicated to the defendant:

"[W]hen evidence is presented involving post-penetration withdrawal of consent, the trial court must do more than simply instruct the jury on the statutory elements of rape. Instead, in such cases, in addition to the rape elements instruction, the trial court must instruct the jury that rape may occur even though consent was given to the initial penetration, but only if the consent is withdrawn, that withdrawal is communicated to the defendant, and the sexual intercourse continues when the victim is overcome by force or fear." *Flynn*, 299 Kan. at 1067.

But *Flynn* substantially limited the applicability of a *Bunyard* instruction because of a legislative amendment:

"We note, however, that because the legislature amended the rape statute in 2012, our decision requiring an additional jury instruction is limited to those cases in which the rape is alleged to have occurred before July 1, 2011. In amending the rape statute, the legislature provided that effective July 1, 2011: '[I]t shall not be a defense that the offender did not know or have a reason to know that the victim did not consent to the sexual intercourse, that the victim was overcome by force or fear, or that the victim was unconscious or physically powerless.' K.S.A. 2013 Supp. 21-5503(e). Because Flynn was convicted of rape for an offense that occurred in 2007 and the controlling statute, K.S.A. 21-3502(a)(1)(A) (2007), did not contain the language now found in K.S.A. 2013 Supp. 21-5503(e), we leave for another day whether a modified *Bunyard* instruction would remain appropriate in cases arising under K.S.A. 2013 Supp. 21-5503(a)(1)(A) for offenses committed after July 1, 2011." *Flynn*, 299 Kan. at 438-39.

Jones recognizes that the Kansas Supreme Court left open whether a modified *Bunyard* instruction applies after the rape statute's amendment. But he believes it is still appropriate because he claims that this court "found that such an instruction is appropriate" in *State v. Ford*, No. 124,236, 2023 WL 1878583, at *7 (Kan. App. 2023)

24

(unpublished opinion), *aff'd* 320 Kan. 507, 571 P.3d 500 (2025). Yet Jones misconstrues this court's holding because in *Ford* we assumed *without deciding* that a modified *Bunyard* instruction was both legally and factually appropriate and instead evaluated whether failing to give the instruction was reversible error. *State v. Ford*, 2023 WL 1878583, at *7. The Kansas Supreme Court followed suit when reviewing that decision. *Ford*, 320 Kan. at 508-09. Other than this misstatement, Jones provides no other argument that a modified *Bunyard* instruction is correct postamendment.

Given the amendment, we find that for any rape alleged to have occurred on or after July 1, 2011, a modified *Bunyard* instruction would run contrary to K.S.A. 2011 Supp. 21-5503(e), which prohibits all defendants charged with rape occurring on or after July 1, 2011, other than those charged under K.S.A. 21-5503(a)(2), from claiming a lack of knowledge or lack of reason to know that "the victim did not consent to the sexual intercourse, that the victim was overcome by force or fear, or that the victim was unconscious or physically powerless." K.S.A. 2011 Supp. 21-5503(e). This amendment provides a legislative directive that defendants cannot claim they did not know or have reason to know the victim did not consent to the sexual intercourse. This language does not permit the defendant to have reasonable time to stop sexual intercourse after the victim withdraws consent. Under the statute, when the victim does not consent, the defendant cannot assert a defense that they did not know or have reason to know this. Since Jones was charged in 2015 with rape and he was not charged under K.S.A. 21-5503(a)(2), a modified *Bunyard* instruction would not have been legally sound. And since the Legislature similarly amended the aggravated criminal sodomy statute, a modified *Bunyard* instruction would not have been legally appropriate for that charge, either. K.S.A. 2011 Supp. 21-5504(f). In addition, as the State points out, a modified *Bunyard* instruction would not have been factually appropriate for that charge since the victim testified she orally withdrew her consent by repeatedly telling Jones "no" and "stop" from the outset of the anal penetration and that Jones disregarded her pleas and told her, "'I don't give a fuck, I'm going to keep going.'"

Even still, Jones believes the district court nevertheless erred when it instructed the jury on aggravated criminal sodomy: "It is not a defense that the defendant did not know or have reason to know that [A.K.] did not consent to the sodomy or was overcome by force or fear." And the court instructed the jury on rape: "It is not a defense that the defendant did not know or have reason to know that [A.K.] did not consent to the sexual intercourse or was overcome by force or fear." Jones asserts that under *Flynn*, the instruction should have stated that "*withdrawal is communicated to the defendant*." But as stated, K.S.A. 21-5503(e) does not require any specific communication about a victim's consent. If a victim does not consent, which would include times where a victim consents and then withdraws that consent, a defendant cannot claim they did not know or have reason to know. While Jones argues that he "had to divine that her initial consent had been withdrawn," that is simply untrue. A.K. used physical gestures and vocalized the withdrawal of her consent. At that point, Jones cannot claim he did not know or have reason to know that A.K. did not consent.

Most importantly, in *State v. Thomas*, 313 Kan. 660, 663, 488 P.3d 517 (2021), the Kansas Supreme Court found that the language Jones complains of is legally appropriate because it mirrors the Kansas rape statute. This court is duty-bound to follow precedent set by the Kansas Supreme Court absent some indication that it is departing from its previous position. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). Additionally, the language, used by the district court and approved as legally appropriate by *Thomas*, is found in PIK Crim. 4th 55.030. The use of PIK instructions is strongly recommended because they have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions. *State v. Buck-Schrag*, 312 Kan. 540, 552-53, 477 P.3d 1013 (2020).

For these reasons, we find a modified *Bunyard* instruction is no longer legally appropriate after the amendment of K.S.A. 2011 Supp. 21-5503(e) and therefore find the district court did not err in failing to give it.

26

*V. Did the district court err when it delivered a consent instruction for the rape and aggravated criminal sodomy charges because that instruction transformed the crimes into strict liability offenses and therefore violated Jones' due process rights?*

Jones argues for the first time on appeal the district court erred when it instructed the jury: "It is not a defense that the defendant did not know or have reason to know that [A.K.] did not consent to sodomy [or 'the sexual intercourse'] or was overcome by force or fear." He believes this jury instruction "transforms" rape and aggravated criminal sodomy into strict liability offenses, which violates the Due Process Clause under the United States Constitution.

This issue is readily solved by binding Kansas Supreme Court precedent. In *Thomas*, the court addressed an identical challenge to a jury instruction that mirrored the rape statute. The court held that even if Thomas was correct that K.S.A. 21-5503(e) effectively renders rape a strict liability crime, he failed to show a violation of his due process rights. The court noted that it had previously upheld the Legislature's authority to craft statutes that criminalize strict liability offenses and remarked that statutory rape under K.S.A. 21-5503(a)(3) ("sexual intercourse with a child who is under 14 years of age") criminalizes rape without proof of a mens rea. 313 Kan. at 664; see also *State v. Genson*, 59 Kan. App. 2d 190, 202, 481 P.3d 137 (2020) ("We begin with the well-established recognition that the Legislature has the authority to create strict liability crimes.").

*Thomas* controls. And since Jones admits in a footnote that K.S.A. 21-5503(e) and K.S.A. 21-5504(f) have "identical language" and therefore his argument "equally" applies to his rape and aggravated criminal sodomy convictions, his argument that aggravated criminal sodomy cannot be a strict liability offense is also controlled and dismissed by *Thomas*. He believes we should depart from *Thomas* but as we recently noted, the Kansas Supreme Court has shown no indication that it is departing from its *Thomas* decision.

27

*State v. Arreola*, 64 Kan. App. 2d 562, 574-76, 554 P.3d 684, *rev. denied* 319 Kan. 834 (2024). We therefore see no error in the court's jury instructions.

VI. *Is the cumulative error doctrine applicable?*

Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. In assessing the cumulative effect of errors during the trial, appellate courts examine the errors in context and consider how the trial judge dealt with the errors as they arose; the nature and number of errors and whether they are interrelated; and the overall strength of the evidence. If any of the errors being aggregated are constitutional, the cumulative effect must be harmless beyond a reasonable doubt. *State v. Guebara*, 318 Kan. 458, 483, 544 P.3d 794 (2024).

The cumulative error rule does not apply if there are no errors or only a single error. *State v. Lowry*, 317 Kan. 89, 100, 524 P.3d 416 (2023). And unpreserved instructional issues that are not clearly erroneous may not be aggregated in a cumulative error analysis. *State v. Waldschmidt*, 318 Kan. 633, 662, 546 P.3d 716 (2024). Although Jones questions *Waldschmidt*, again, we are duty-bound to follow precedent set by the Kansas Supreme Court absent some indication that it is departing from its previous position. *Rodriguez*, 305 Kan. at 1144. Jones has cited no such indication.

The only assumed error we found was the prosecutor's blanket legal statements about consent and age. Therefore, the cumulative error doctrine is inapplicable.

VII. *Did the district court err when it imposed a $400 fee for each count for the Children's Advocacy Center?*

Jones has a few arguments about his postconviction orders. The first issue he raises is that the district court erred under K.S.A. 20-370 because it ordered Jones to pay the Children's Advocacy Center a $400 fee for all four counts he was charged and convicted of. He believes this statute requires payment of only $400 per case and not per offense. Jones therefore asks this court to remand this case and order him to pay only $400.

Statutory interpretation presents a question of law over which appellate courts have unlimited review. *State v. Betts*, 316 Kan. 191, 197, 514 P.3d 341 (2022).

Despite Jones' failure to object to this issue below, we will nevertheless assess the merits of his arguments. Generally, issues not raised to the district court cannot be raised on appeal. See *State v. Green*, 315 Kan. 178, 182, 505 P.3d 377 (2022). But there are limited exceptions to this rule:

> "(1) the newly asserted theory involves 'only a question of law arising on proved or admitted facts and the issue is finally determinative of the case'; (2) 'resolution of the question is necessary to serve the ends of justice or to prevent denial of fundamental rights'; and (3) the district court reached the right result for the wrong reason." *State v. Johnson*, 309 Kan. 992, 995, 441 P.3d 1036 (2019) (quoting *Trotter v. State*, 288 Kan. 112, 124-25, 200 P.3d 1236 [2009]).

Jones asserts that the first exception applies because his claim is that the district court erred by imposing fees above the statutory limitation. Put differently, his argument is a question of statutory interpretation which is a question of law. The State does not dispute Jones' ability to raise this argument for the first time on appeal.

Jones' argument is that under K.S.A. 20-370(a), Jones should only be assessed a $400 fee instead of $1,600. K.S.A. 20-370(a) reads:

"On and after July 1, 2013, any defendant convicted of a crime under chapter 21 of the Kansas Statutes Annotated, and amendments thereto, in which a minor is a victim, shall pay an assessment fee in the amount of $400 to the clerk of the district court. All moneys received pursuant to this section shall be remitted to the state treasurer in accordance with the provisions of K.S.A. 75-4215, and amendments thereto. Upon receipt of each such remittance, the state treasurer shall deposit the entire amount in the state treasury to the credit of the children's advocacy center fund established in subsection (b)."

The Kansas Supreme Court has provided directions on how to interpret statutes:

"The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. In ascertaining this intent, we begin with the plain language of the statute, giving common words their ordinary meaning. When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. But if a statute's language is ambiguous, we will consult our canons of construction to resolve the ambiguity. [Citations omitted.]" *Johnson v. U.S. Food Service*, 312 Kan. 597, 600-01, 478 P.3d 776 (2021).

Utilizing this guidance, this court has decided that under K.S.A. 20-370, the Legislature intended for a single criminal defendant convicted of multiple crimes against minors to pay a fee for each crime committed against minors. See *State v. Sanders*, 65 Kan. App. 2d 236, 264, 563 P.3d 234, *rev. denied* 320 Kan. 867 (2025); *State v. McDuffie*, No. 113,987, 2017 WL 2617648, at *16-21 (Kan. App. 2017) (unpublished opinion). Both Jones and the State allocate much of their briefing on *McDuffie* although Jones filed a 6.09 letter recognizing *Sanders*' holding.

In *McDuffie*, this court determined the language of the statute could be read two ways: (1) as creating a "one-to-one ratio, where defendants convicted of one crime against a minor are required to pay one fee, but defendants convicted of multiple crimes against minors are required to pay the number of fees equal to the crimes committed against minors"; or (2) "as requiring a defendant convicted of any unspecified number of crimes against minors to pay just one assessment fee." 2017 WL 2617648, at *19. Here, the former would mean that Jones is responsible for a $400 fee for each crime, or $1,600 in total. The later would favor Jones' argument that he shall solely be responsible for a singular $400 assessment fee.

Because in *McDuffie* we found the language ambiguous, we turned to the statute's legislative history as *Johnson* directs us to do. We ultimately concluded that "K.S.A. 20-370's legislative history establishes that the legislature intended to create a one-to-one crime-to-fee ratio requiring defendants to pay a CACF [Child Advocacy Center Fund] assessment fee for each crime they are convicted of committing against a minor." *McDuffie*, 2017 WL 2617648, at *19. We reviewed testimony from various committee hearings in the Legislature and determined that established "the purpose of K.S.A. 20-370(a)'s CACF assessment fee is (1) to punish defendants and (2) to raise revenue." 2017 WL 2617648, at *19.

We first turned to testimony before the House's Corrections and Juvenile Justice Committee and the Senate's Ways and Means Committee to establish the statute's purpose. The testimony showed the statute was enacted to hold defendants who abused children financially accountable. We concluded that based on this legislative history, "it is readily apparent that the legislature agreed that defendants should be punished financially for the crimes that they commit against minors." *McDuffie*, 2017 WL 2617648, at *19.

In addition to holding defendants financially accountable, we also found that the legislative history showed another purpose of the statute, in its current form, is to increase revenue. A 2013 amendment to the statute increased the fee from $100 to $400, and deleted a provision allowing courts to waive the fee. 2017 WL 2617648, at *19. We explained:

> "During a 2013 hearing in the Senate Judiciary Committee, Senator David Haley questioned whether the fee should be increased so much, and Senator Greg Smith responded that undue financial hardship for convicted child abusers was not an issue of concern. The fact that the 2013 amendment to K.S.A. 20-370(a) was passed establishes that the majority of the legislature agreed with Senator Smith." 2017 WL 2617648, at *19.

In *McDuffie* we also noted that while advocating for the amendments in the House Appropriations Committee, Senator Smith was recorded as stating "'that *fees* are not collected until *the party* is found guilty.'" 2017 WL 2617648, at *20. We found that Senator Smith's testimony "strongly indicates that the legislature intended defendants to pay a fee for each crime they committed against a minor. There would have been no reason for Senator Smith to reference multiple fees but only a single defendant if this were not the case." 2017 WL 2617648, at *20.

In relation to increasing revenue, we noted that in addition to Senator Smith's statement, "because K.S.A. 2016 Supp. 20-370(a) was clearly enacted for revenue purposes, one would assume that the legislature intended for defendants to pay a fee for each crime committed against a minor. Ensuring defendants pay a fee per crime committed against a minor better serves the statute's goal of raising revenue." 2017 WL 2617648, at *20.

We reached the same conclusion in *Sanders* that we reached in *McDuffie* but through a distinct analysis. We first observed "[t]he issue of whether fees are assessed per

32

charge, per crime, per case or per traffic citation is an issue upon which the Legislature has been consistent and clear." *Sanders*, 65 Kan. App. 2d at 261. We evaluated K.S.A. 8-2110(c), prior to its 2024 amendment, which noted that a district court should assess a reinstatement fee "for each charge" if an individual fails to comply with a traffic citation. This language was amended recently to state that failure to comply with a traffic citation shall result in the district court "assess[ing] a reinstatement fee of $100." L. 2024, ch. 101, § 2 (S.B. 500). The legislative summary for S.B. 500 explained that this amendment replaced the requirement that a separate $100 reinstatement fee applied *for each charge*.

We evaluated other statutes like K.S.A. 28-172a, a law regarding docketing fees, that holds: "(c) *If a conviction is on more than one count*, the docket fee shall be the highest one applicable to any one of the counts. The prosecuting witness or defendant, if assessed the costs, *shall pay only one fee*. Multiple defendants shall each pay one fee." (Emphases added.) *Sanders*, 65 Kan. App. 2d at 263. And we assessed K.S.A. 32-1049a, a statute about failure to comply with a wildlife and parks citation, that states "*failure to comply with a sentence of the district court imposed on violation of a wildlife and parks law or rule and regulation*, the court shall assess a reinstatement fee of $50 *for each charge or sentence* on which the person failed to make satisfaction." (Emphases added.) 65 Kan. App. 2d at 263. K.S.A. 28-176 declares that "'[t]he court shall order any person convicted . . . to pay a separate court cost of $400 for *every individual offense*.'" (Emphasis added.) 65 Kan. App. 2d at 264.

After surveying these statutes, we found in *Sanders* that since K.S.A. 20-370 "specifies 'a crime,' which is a singular event, as is 'a charge,'" it requires a defendant convicted of a crime against a minor victim to pay an assessment fee for each crime committed against a minor. 65 Kan. App. 2d at 264. It is unlike other statutes that limit the fee to per case, per complaint, or per traffic citation. 65 Kan. App. 2d at 264.

33

Jones disagrees with *McDuffie* and *Sanders* and offers two arguments in opposition. First, he contends that because statutes like K.S.A. 28-176 state the applicable fee is "for every individual offense," *expresio unius est exlusio alterius* is invoked. This canon of construction means "the inclusion of one thing implies the exclusion of another." *Cole v. Mayans*, 276 Kan. 866, 878, 80 P.3d 384 (2003). In the context of statutory interpretation, when an item is not in a specific list, a court can presume that the Legislature intended to exclude it. 276 Kan. at 878. Jones fails to explain what list K.S.A. 20-370 includes and does not expound on how an alleged "list" in one statute is relevant to a separate statute. Nor does he point to any caselaw that uses the *expresio unius est exlusio alterius* maxim across two distinct statutes.

Perhaps Jones' point is better described in his 6.09 letter. There, he asserts that because the Legislature did not use the language like it does in other statutes—e.g., "for each charge," "for each charge or sentence" or "every individual offense"—the Legislature intended to impose only one fee per case. He elaborates that if the Legislature wanted defendants to pay a Children's Advocacy Center fee per crime, it could have written so since other statutes specify a per charge, per sentence, or per offense phrasing. But Jones does not reconcile this argument with the *Sanders* court's brief, but effective, conclusion: "a crime" as used in K.S.A. 20-370, is a "singular event." 65 Kan. App. 2d at 264. A crime is distinct from a case because a case can have multiple crimes. 65 Kan. App. 2d at 262. And by Jones' same logic, if the Legislature intended the fee to only apply per case, the Legislature could have written so rather than using "a crime."

Jones' second argument is that if the statute is ambiguous like we found in *McDuffie*, then the rule of lenity applies. "[T]he rule of lenity, guides us when determining the meaning of an ambiguous criminal statute. When there is a reasonable doubt about the statute's meaning, we apply the rule of lenity and give the statute a narrow construction. [Citations omitted.]" *State v. Braun*, 47 Kan. App. 2d 216, 217, 273 P.3d 801 (2012). There are two issues with Jones' rule of lenity argument. Primarily,

34

*Sanders'* statutory interpretation of K.S.A. 20-370's plain language shows that a Children's Advocacy Center fee applies *per crime*, not per case. Its use of the singular "a crime" requires Jones to be responsible per crime for a Children's Advocacy Center fee. This is unambiguous. But even to the extent we found in *McDuffie* that the statute's language is ambiguous, that does not correlate to the entire statutory interpretation analysis being ambiguous. *Johnson* directs courts to focus attention on intent of the Legislature. 312 Kan. 597, Syl. ¶ 1. In fact, in *McDuffie* we determined the Legislature's intent was established through legislative history. That means there is no reasonable doubt of the Legislature's intent or meaning of the statute, which is required for invocation of the rule of lenity. Even if there is a question about the meaning of a statute's text, that does not inherently mean the Legislature's intent cannot be ascertained through other permissible means.

As explained by *Sanders*, K.S.A. 20-370 requires Jones to pay the Children's Advocacy Center fee per crime, which means the district court correctly sentenced Jones when it imposed the fee per offense instead of per case. That said, as explained below, the district court incorrectly counted the offenses when it assessed the fees.

VIII. *Did the district court err when it imposed a $400 fee for each count for the Children's Advocacy Center, the Regional Forensic Science Center, and the Internet Crimes Against Children?*

Jones argues the district court erred in ordering Jones to pay $1,600 to the Children's Advocacy Center, the Regional Forensic Science Center, and the Internet Crimes Against Children because it assessed a $400 fee per charge and included four charges. Although the jury found Jones guilty of four counts, he only stands convicted of two offenses because the alternative counts merged. See *State v. Vargas*, 313 Kan. 866, Syl. ¶ 3, 492 P.3d 412 (2021) ("Where alternatively charged counts result in multiple guilty verdicts for alternative ways of committing one crime, the multiple verdicts merge

35

into one conviction."). The State agrees the district court should have only assessed fees for two offenses, rather than four.

K.S.A. 28-176(a) states:

"The court shall order any person convicted or diverted, or adjudicated or diverted under a preadjudication program pursuant to K.S.A. 22-2906 et seq., K.S.A. 38-2346 et seq., or 12-4414, and amendments thereto, of a misdemeanor or felony contained in chapters 21, 41 or 65 of the Kansas Statutes Annotated, and amendments thereto, or a violation of K.S.A. 8-2,144 or 8-1567, and amendments thereto, or a violation of a municipal ordinance or county resolution prohibiting the acts prohibited by such statutes, unless the municipality or county has an agreement with the laboratory providing services that sets a restitution amount to be paid by the person that is directly related to the cost of laboratory services, to pay a separate court cost of $400 for every individual offense if forensic science or laboratory services, forensic computer examination services or forensic audio and video examination services are provided, in connection with the investigation, by: [various entities]."

The district court erred in finding Jones owes $1,600 in fees to each of these entities because Jones should only be responsible for a $400 fee for "every individual offense" (unlike per *crime*). K.S.A. 28-176(a).

We therefore vacate the portion of Jones' sentence assessing these fines and remand with instructions that the district court order Jones to pay $800 in fees to each of these entities since Jones was only convicted of two offenses.

Affirmed in part, vacated in part, and remanded with directions.